178 N.J. Super. 275 (1981)
428 A.2d 947
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES DOLCE, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1980.
Decided April 3, 1981.
*278 Before Judges MICHELS, ARD and FURMAN.
Joseph Hillman, Jr. argued the cause for appellant (Hillman, Badach & Sullivan, attorneys).
Kim A. Otis, Deputy Attorney General, argued the cause for respondent (John J. Degnan, Attorney General of New Jersey, attorney; William T. Koch, Jr., Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
*279 Defendant James Dolce, Jr., appeals his convictions for possessing (1) a hypodermic syringe, in violation of N.J.S.A. 2A:170-77.5, and (2) prescription legend drugs, which were not controlled dangerous substances, in violation of N.J.S.A. 2A:170-77.8. Defendant entered guilty pleas to these offenses and to interfering with a police officer, in violation of N.J.S.A. 2A:170-29(2)(b). He was sentenced to concurrent six-month terms in the Monmouth County Correctional Institution. The sentences were suspended and defendant was fined $500.
On this appeal defendant challenges the trial court's denial of his motions (1) for a conditional discharge under § 27 of the New Jersey Controlled Dangerous Substances Act (N.J.S.A. 24:21-1 et seq.), and (2) to suppress evidence seized as the result of a search conducted by the New Jersey State Police pursuant to the provisions of N.J.A.C. 13:70-14.21 (current version at N.J.A.C. 13:70-14A.12), of the rules of the New Jersey Racing Commission (Racing Commission).
The proofs offered by the State at the suppression hearing established that on July 12, 1978 a horse named "Wild Spot," which was trained by defendant, won a race at the Monmouth Park Racetrack in Oceanport, New Jersey. A chemical test performed after the race revealed the presence of the drug Butazolidin in the horse's blood. This constituted a violation of N.J.A.C. 13:70-14.17 (current version at N.J.A.C. 13:70-14A.1). On July 14, 1978 State Police Detectives Seifert and Wolkowski, who were assigned to the State Police Racetrack Unit, were called to the Monmouth Park State Steward's office by State Steward Boulmetis. Boulmetis also summoned defendant to his office pursuant to N.J.A.C. 13:70-14.21(a)(2) (current version at N.J.A.C. 13:70-14(a).12(a)(2)). Boulmetis informed those present of the finding of Butazolidin in Wild Spot's blood. Boulmetis then directed the detectives to search defendant's stable area for drugs. The stable area occupied by defendant was approximately one-half mile away from the steward's office. *280 The detectives believed that it would be easier to drive than walk to the area. However, their car was several hundred yards away on the opposite side of the racetrack. Defendant, whose pick-up truck was parked near the steward's office, volunteered to drive the detectives to the area. The detectives accepted the invitation. Defendant drove the truck. Wolkowski sat in the right front seat of the cab and Seifert sat in the back seat. While proceeding towards the stable, Seifert asked defendant whether he had a prescription for Butazolidin. Defendant replied that he had a veterinary's authorization for the drug, but that it was issued for another horse. Defendant stated that the document was in his wallet which was inside the glove compartment. Defendant thereupon reached over and opened the glove compartment. When the glove compartment was opened, a hypodermic syringe rolled out towards Wolkowski, who immediately seized it.
When they arrived at the stable area defendant was placed under arrest for possessing the hypodermic syringe. Seifert and Wolkowski immediately made a cursory search of the stall where Wild Spot had been kept and of a small feed shed assigned to defendant. The search did not reveal anything relevant to the drug investigation. Defendant was then informed that because he was under arrest for possession of the hypodermic syringe, which was found inside the truck, a search of his truck would be made. Defendant suddenly became uncooperative and belligerent. He entered the truck, and attempted to drive away. However, the detectives were able to prevent defendant's escape. They physically restrained him, but did not place him in handcuffs. The detectives then searched the truck. They found a small carrying case, approximately 18" X 12" X 4" located directly behind the driver's seat. The small case was opened and found to contain Schedule II narcotic drugs, specifically, Sublimaze, Innovar and Ritalin.
Defendant was charged in the Oceanport Municipal Court with three disorderly persons violations, specifically, interfering with a police officer (N.J.S.A. 2A:170-29(2)(b)), possession of a *281 hypodermic syringe (N.J.S.A. 2A:170-77.5) and unlawful possession of prescription legend drugs (N.J.S.A. 2A:170-77.8), and with one criminal offense, to wit, possession of the controlled dangerous substances Sublimaze, Innovar and Ritalin (N.J.S.A. 24:21-20(a)(1)). Thereafter, defendant was indicted by the Monmouth County grand jury for possession of the controlled dangerous substances. He moved for conditional discharge under § 27 of the New Jersey Controlled Dangerous Substance Act (N.J.S.A. 24:21-27). His motion was denied by Judge Shebell, whose opinion is reported in State v. Dolce, 165 N.J. Super. 488 (Law Div. 1979). Defendant then moved to suppress the evidence seized by the detectives. Judge Cunningham, at the conclusion of a contested hearing, found that the testimony of the two detectives was credible and that the hypodermic syringe was in plain view, and thus upheld the arrest and consequent search of the truck and carrying case and the seizure of the drugs. Thereafter, defendant entered guilty pleas to the three disorderly persons violations and the indictment charging possession of the controlled dangerous substances was dismissed. This appeal followed.

I

The Denial of Defendant's Motion to Suppress Evidence.

A
Defendant challenges the trial judge's denial of his suppression motion, contending that N.J.A.C. 13:70-14.21, pursuant to which the search was conducted, is unconstitutional. N.J.A.C. 13:70-14.21 provided:
(a) On receiving written notice from the official chemist that a specimen has been found "positive" for any of the substances specified in Sections 17, 19 and 20 of this Subchapter, the stewards shall proceed as follows:
1. They shall notify State and track police and authorize these authorities to conduct a search of the premises occupied by the stable involved.
2. They shall, as quickly as is possible, notify the owner and trainer of the horse involved.
3. They shall, with the assistance of the policing agencies cited above, conduct a thorough investigation, interviewing the trainer, assistant trainer and *282 any other persons who may have pertinent knowledge of the circumstances involved.
4. During the progress of such investigation, the stable involved shall be permitted to race; save that the particular horse (or horses) involved shall not be entered or start until allowed to do so by the stewards.
5. Should the stewards determine that any person is guilty of violation of any of Sections 15, 16, 17 or 19 of this Subchapter, they may punish the offender by fine, suspension or ruling off.
Defendant claims that the foregoing regulation authorizes a warrantless search in violation of the Fourth Amendment of the United States Constitution. He contends, therefore, that the evidence seized pursuant to such search must be suppressed, relying primarily upon Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). In the Marshall case the United States Supreme Court held that a search warrant was necessary before a federal OSHA inspector could enter business premises when looking for safety violations. In reaching this conclusion the Supreme Court stated:
Nor do we agree that the incremental protections afforded the employer's privacy by a warrant are so marginal that they fail to justify the administrative burdens that may be entailed. The authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search. A warrant, by contrast, would provide assurances from a neutral officer that the inspection is reasonable under the Constitution, is authorized by statute, and is pursuant to an administrative plan containing specific neutral criteria. Also, a warrant would then and there advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed. These are important functions for a warrant to perform, functions which underlie the Court's prior decisions that the Warrant Clause applies to inspections for compliance with regulatory statutes. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). We conclude that the concerns expressed by the Secretary do not suffice to justify warrantless inspections under OSHA or vitiate the general constitutional requirement that for a search to be reasonable a warrant must be obtained.
[436 U.S. at 322-324, 98 S.Ct. at 1825-1827, 56 L.Ed.2d at 317-319; footnotes omitted]
Unquestionably, the clear import of the Marshall case, as well as Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), and Almeida-Sanchez v. United States, *283 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), is that an administrative search of private property without proper consent is generally held unconstitutional unless it has been authorized by a valid search warrant. One of the recognized exceptions, however, to the administrative search warrant requirement, involves activities within a particular industry that has been subject to pervasive or long-standing governmental regulation. For example, in Colonnade Catering Corp. v. United States, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), the federal inspectors, without a warrant and without the owner's permission, forcibly entered a locked storeroom and seized bottles of liquor that were suspected of having been illegally refilled in violation of federal law. The Supreme Court, emphasizing the long history of regulation of the liquor industry, noted in dictum that a warrantless search could be made under federal law of the premises of liquor dealers. Therein the court stated:
We agree that Congress has broad power to design such powers of inspection under the liquor laws as it deems necessary to meet the evils at hand. The general rule laid down in See v. City of Seattle, supra [387 U.S.], at 545 [87 S.Ct. at 1740], 18 L.Ed.2d at 947  "that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure"  is therefore not applicable here.
[397 U.S. at 76, 90 S.Ct. at 777, 25 L.Ed.2d at 64]
Similarly, in United States v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), a federal treasury agent conducted a warrantless search of a gun shop pursuant to statutory authorization contained in the Gun Control Act, 18 U.S.C.A. § 921 et seq. The Supreme Court upheld the warrantless search, noting the pervasive system of regulation imposed on licensed gun dealers. The Supreme Court held that a businessman in a regulated industry in effect consents to the restrictions imposed upon him when he applies for a license, stating:
It is also apparent that if the law is to be properly enforced and inspection made effective, inspections without warrant must be deemed reasonable official conduct under the Fourth Amendment. In See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), the mission of the inspection system was to discover and correct violations of the building code, conditions that were relatively difficult to conceal or to correct in a short time. Periodic inspection *284 sufficed, and inspection warrants could be required and privacy given a measure of protection with little if any threat to the effectiveness of the inspection system there at issue. We expressly refrained in that case from questioning a warrantless regulatory search such as that authorized by § 923 of the Gun Control Act. Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible.
It is also plain that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection. Each licensee is annually furnished with a revised compilation of ordinances that describe his obligations and define the inspector's authority. 18 U.S.C. § 921(a)(19). The dealer is not left to wonder about the purposes of the inspector or the limits of his task. [406 U.S. at 316, 92 S.Ct. at 1596, 32 L.Ed.2d at 92-93]
In State v. Zurawski, 89 N.J. Super. 488 (App.Div. 1965), aff'd o.b. 47 N.J. 160 (1966), which was decided prior to the Supreme Court decisions in Colonnade Catering Corp. and Biswell, we upheld a warrantless search of a tavern on the ground that the liquor industry in this State was highly regulated. There, the administrative search was authorized by the Legislature and consented to by the licensee when he obtained the appropriate license to operate a tavern. Recently, in In re Environmental Protection Dep't, 177 N.J. Super. 304 (App.Div. 1981), we held that the Department of Environmental Protection has the power to impose a warrantless inspection provision as a condition for the issuance of a permit to construct a facility to treat industrial wastewater. We concluded, after a thorough discussion of the warrantless search rule, that the activity involved "fits under the pervasive government regulation (Biswell) exception to the administrative search requirement...." (at 315).
Here, the activity in which defendant was involved  horse racing  has been subject to pervasive and long-standing regulation by New Jersey. The State has had and continues to have a vital interest in the horse racing industry, particularly with respect to maintaining its integrity. Jersey Downs, Inc. v. *285 N.J. Racing Comm'n, 102 N.J. Super. 451, 457 (App.Div. 1968). Consequently, our Legislature established the Racing Commission and vested in it the power and duty to govern all aspects of horse racing in this State, including all those working in the industry. N.J.S.A. 5:5-22. To this end, the Racing Commission was granted broad rule-making powers to protect the State's interest in the industry and to carry out its statutory mandate. N.J.S.A. 5:5-30. Thus, it is clear that horse racing in this State fits under both the pervasive and long-standing government regulation exceptions to the administrative search warrant rule, as enunciated by the United States Supreme Court in the Colonnade Catering Corp. and Biswell cases and by this court in the Zurawski and In re Dept. of Environmental Protection of N.J. cases. Hence, we hold that the provisions of the Racing Commission's former regulation N.J.A.C. 13:70-14.21 did not violate the Fourth Amendment of the United States Constitution.
Additionally, there is also no merit in defendant's contention that N.J.A.C. 13:70-14.21 was improperly adopted. The regulation was adopted pursuant to the notice and hearing requirements of N.J.S.A. 52:14B-4 and became effective on February 21, 1975. Plaintiff failed to challenge the regulation on procedural grounds within one year of its effective date and is, therefore, barred from doing so now. N.J.S.A. 52:14B-4(d).
Furthermore, N.J.A.C. 13:70-14.21 does not violate the Equal Protection Clause of the Fourteenth Amendment. Contrary to defendant's argument, the regulation should not and cannot be read as authorizing searches only of premises occupied by stables at the racetrack. The regulation, on its face, does not make any distinction between on-track premises and off-track premises. It plainly and simply authorizes a search "of the premises occupied by the stable involved." There is no differentiation between the classes of persons stabled at the track and those stabled elsewhere. There is nothing in the Racing Commission's regulations or in the record submitted in connection *286 with this appeal that supports the conclusion that the Racing Commission intended that off-track racing stables be immune from the administrative searches authorized by N.J.A.C. 13:70-14.21.
Defendant's claims that the Racing Commission lacked the statutory authority to promulgate N.J.A.C. 13:70-14.21 is also without merit. As pointed out above, the Legislature reposed in the Racing Commission the power necessary and proper to enable it to carry out fully and effectually all of the provisions and purposes of the act. N.J.S.A. 5:5-22. The Legislature specifically empowered the Racing Commission to prescribe rules, regulations and conditions under which all horse racing shall be conducted in this State. N.J.S.A. 5:5-30. Additionally, it authorized the Racing Commission to employ persons to enforce all laws of the State and the provisions of the act. N.J.S.A. 5:5-77. The persons so appointed by the Racing Commission are "responsible to no one in the conduct of their duties except the Racing Commission," and "may be assigned such duties as the Commission may, in its discretion, deem necessary...." N.J.S.A. 5:5-77.
Consequently, when we examine the broad powers conferred upon the Racing Commission in the light of the statutory policy sought to be achieved by our Legislature, we have no hesitancy in concluding that the power to authorize warrantless administrative searches may reasonably be implied from the enabling legislation. We have consistently held that the powers of an administrative agency should be liberally construed to permit the agency to achieve the task assigned to it, and that the administrative agency has such implied incidental powers as may reasonably be adapted to that end. See, e.g., New Jersey Guild of Hearing Dispensers v. Long, 75 N.J. 544, 561-564 (1978); In re Heller Suspension, 73 N.J. 292, 303 (1977); Camarata v. Essex Cty. Park Comm'n, 26 N.J. 404, 411 (1958). The execution of a warrantless administrative search of premises occupied by a stable after one of its horses tested positive for a drug is necessary and reasonable in order to enforce the regulations *287 of the Racing Commission and maintain the integrity of the horse racing industry in this State.
Finally, we have carefully considered the other arguments raised by defendant in support of his constitutional challenge to the regulation and are satisfied that all are clearly without merit. R. 2:11-3(e)(2).
Accordingly, we hold that N.J.A.C. 13:70-14.21 was constitutional and properly authorized the detectives to search the stable area occupied by defendant at the Monmouth Park Racetrack. The search of defendant's pick-up truck and its contents, particularly the small carrying case, was within the scope of the area authorized to be searched by the regulation and the contraband was properly seized. The search of the premises occupied by defendant was not restricted or limited solely to the stall occupied by defendant's horse Wild Spot. The scope of the search properly included the stable area occupied by defendant, and extended to the stalls, barns, sheds and horse trailers and other equipment, such as the pick-up truck, located in the immediate stable area, which defendant utilized in connection with his license to race horses.

B
Entirely apart from the fact that we are satisfied that the hypodermic syringe and the controlled dangerous substances were properly seized pursuant to a valid warrantless administrative search, the search of defendant's truck is also sustainable as incidental to a lawful arrest. Defendant volunteered to drive the two detectives to the stable area. While en route, defendant opened the glove compartment from which the hypodermic syringe fell into plain view. In light of this, the hypodermic syringe was properly held admissible under the plain view doctrine and defendant does not contest this. Coolidge v. New Hampshire, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583 (1971), reh. den. 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971); Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1968).
*288 Once the hypodermic syringe was observed, the detectives had probable cause to believe that a crime was being or had been committed, and that contraband was contained in the pick-up truck. The detectives clearly had the right to and, in fact, did place defendant under arrest when they arrived at the stable area. The detectives first made an immediate cursory search of the stall and feed shed and found nothing. They then turned towards the truck. When they announced that they were going to search the truck, defendant attempted to escape in the truck. The search of the truck and the small carrying case located directly behind the driver's seat was necessary to prevent a further attempt by defendant to escape and to destroy the contraband evidence contained therein. In these circumstances the search and seizure were properly incidental to the lawful arrest of defendant. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), reh. den. 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969); State v. Sims, 75 N.J. 337 (1978); State v. Gray, 59 N.J. 563, 569 (1971); State v. Campbell, 53 N.J. 230 (1969); State v. Mark, 46 N.J. 262 (1962); State v. Miller, 126 N.J. Super. 572, 574-576 (App.Div. 1974).
Moreover, the search of the pick-up truck and the carrying case and the seizure of the controlled dangerous substances were valid because there was probable cause to believe that a violation of our narcotic laws was being or had been committed. In the light of these circumstances, coupled with the mobility of the truck, and defendant's attempt to flee the scene after being placed under arrest, there was certainly no need to obtain a warrant. Chambers v. Maroney, 399 U.S. 42, 50-52, 90 S.Ct. 1975, 1980-1981, 26 L.Ed.2d 419 (1970), reh. den. 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); State v. Waltz, 61 N.J. 83, 88 (1972).
State v. Slockbower, 79 N.J. 1 (1979), and State v. Ercolano, 79 N.J. 25 (1979), relied upon by defendant in support of his suppression motion, are clearly distinguishable. In those cases, unlike the situation here, the court was dealing with an impoundment *289 of a motor vehicle and an inventory search. We point out that State v. Patino, 83 N.J. 1 (1980), which was decided while this appeal was pending, is also factually distinguishable. Patino involved a trunk search, an area clearly outside defendant's immediate control, and therefore does not mandate suppression of the evidence seized in this case.
Finally, we deem it appropriate to observe that prior to the United States Supreme Court's decision in Arkansas v. Sanders, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), there does not appear to be any decision of that court which forebade the search of luggage during an otherwise valid but warrantless automobile search. While, arguably, United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), decided on June 21, 1977, could have been so construed, we do not view the seizure there of the footlocker in the trunk of a parked car as involving the "automobile" exception to the warrant requirement. In our view, the court was simply dealing with a luggage search. See the concurring opinion of Chief Justice Burger in Arkansas v. Sanders, supra, 442 U.S. at 766-767, 99 S.Ct. at 2595, 61 L.Ed.2d at 247.
Additionally, there are marked differences between the footlocker in Chadwick and the small carrying case here, both in the expectation of privacy therein and the concomitant constitutional protections afforded thereto. As was stated in United States v. Venizelos, 495 F. Supp. 1277 (S.D.N.Y. 1980):
It is true, as the defendant argues, that the handbag at issue here, like the footlocker and luggage of Chadwick and Sanders, served as "a common repository for the defendant's personal effects, and therefore was inevitably associated with the expectations of privacy." But there are obvious, significant differences between them as well. As the Court of Appeals for the First Circuit, whose opinion was affirmed on appeal, stated in the Chadwick case:
[T]here is considerable difference between items such as [a] hand-carried briefcase and the footlocker here. Portable objects in hand such as zipper bags, briefcases and small suitcases, fit without too much difficulty into Chimel's "immediate control" standard. Their size, accessibility, and portability all liken them to "personal effects" found on an arrestee's person, such as *290 clothing or a cigarette package in one's pocket, which may lawfully be searched without a warrant as incident to an arrest. See United States v. Robinson [414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427], supra; United States v. Edwards [415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771], supra. To exclude searches of such items can create "gossamer thin" distinctions which arresting officers could find impracticable, if not impossible, to follow; and where the justification for a search depends to a great extent on the reasonable judgments which the arresting officers could have made at the time of arrest, see United States v. Robinson, supra, those distinctions would appear unwarranted.
In affirming that opinion, the Supreme Court limited its holding to "luggage or other personal property not immediately associated with the person of the arrestee." Thus, the court left intact the long line of cases authorizing searches incident to arrest of personal effects  such as the handbag involved here  found in the immediate possession of the arrestee during the course of a lawful arrest. And it reiterated prior holdings that: "The potential dangers lurking in all custodial arrests make warrantless searches of items within the `immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved." [at 1282, footnotes omitted]
Here, when the hypodermic syringe rolled out of the glove compartment, the area immediately behind the driver's seat from which the small case was taken was easily within defendant's immediate control. Later, when the defendant ran into the truck, climbed into the driver's seat and attempted to escape, this area again came within his immediate control. Thus, when the police successfully restrained defendant, their immediate search of the area behind the driver's seat and the resulting seizure of the controlled dangerous substances was entirely reasonable and proper.
In any event, constitutional limitations on the search of luggage seized with probable cause during a valid warrantless search of an automobile were not clearly established until Arkansas v. Sanders, supra, was decided on June 20, 1979. Sanders was not decided when the search in the present case was made on July 14, 1978. In State v. Howery, 80 N.J. 563, 569-571 (1979), our Supreme Court refused to apply the exclusionary rule retroactively. The court concluded that the deterrent purposes *291 of the exclusionary rule were not served by retroactive application, especially where the reliability of the evidence was unquestioned. See United States v. Peltier, 422 U.S. 531, 535, 95 S.Ct. 2313, 2316, 45 L.Ed.2d 374, 380 (1975). Therefore, the rule enunciated by Sanders should not be applied retroactively to a search and seizure that, as here, occurred prior to the date of its determination. State v. Kahlon, 172 N.J. Super. 331, 341 (App. Div. 1980). See, also, State v. Carpentieri, 82 N.J. 546, 548-549 (1980). Cf. United States v. Berry, 571 F.2d 2, 3 (7 Cir.1978), cert. den. 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978); United States v. Reda, 563 F.2d 510 (2 Cir.1977), cert. den. 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65, reh. den. 436 U.S. 923, 98 S.Ct. 2275, 56 L.Ed.2d 766 (1978); United States v. Montgomery, 558 F.2d 311 (5 Cir.1977) (holding that Chadwick was not to be applied retroactively).

C
We have carefully considered defendant's contention that the trial judge erred (1) in applying an incorrect burden of proof in evaluating the testimony, and (2) in excluding certain evidence at the suppression hearing, and find that they are clearly without merit. R. 2:11-3(e)(2).
Accordingly, the order denying defendant's motion to suppress the evidence is affirmed.

II

The Denial of the Motion for a Conditional Discharge.
We affirm the denial of defendant's motion for conditional discharge for the reasons expressed by Judge Shebell in his written opinion in State v. Dolce, 165 N.J. Super. 488 (Law Div. 1979).
Affirmed.