**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2795-19
A-3291-19

JOHN COLASANTI,

     Petitioner-Appellant,

v.

NEW JERSEY RACING
COMMISSION,

     Respondent-Respondent.

_____

> Argued August 2, 2021 – Decided August 31, 2021
>
> Before Judges Mayer and Susswein.
>
> On appeal from the New Jersey Racing Commission, Department of Law and Public Safety, Docket Nos. NJRC-7-H-18-FR and NJRC-8-H-18-TR.
>
> Charles J. Uliano argued the cause for appellant John Colasanti (Chamlin, Uliano & Walsh, attorneys; Charles J. Uliano, of counsel; Andrew T. Walsh, on the briefs).
>
> Jonathan S. Sussman, Deputy Attorney General, argued the cause for respondent New Jersey Racing Commission (Andrew J. Bruck, Acting Attorney

General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Jonathan S. Sussman, on the briefs).

PER CURIAM

Appellant, John Colasanti, appeals from two final agency decisions rendered by the New Jersey Racing Commission (Commission) on January 31, 2020. In the first decision, the Commission denied Colasanti's application for a standardbred stable employee license, referred to as a groom's license. The second decision found that Colasanti violated regulations by transporting racehorses after his license had been revoked, entered a race paddock that was restricted to licensed personnel, and refused to cooperate with an investigator who confronted him in the restricted area. The Commission imposed a two-year suspension and a $1,000 fine on those violations. We calendared the appeals back-to-back and now consolidate them for the purpose of issuing a single opinion. After carefully reviewing the record in view of the arguments of the parties and governing principles of law, we affirm both final agency decisions.

We presume the parties are familiar with the procedural history and pertinent facts, which need only be briefly summarized. Colasanti was first licensed in the horseracing industry as a groom in 1988 and as a trainer in 1989.

2

A groom's license authorizes the licensee to perform duties such as walking a racehorse or cleaning a stable.  N.J.A.C. 13:70-2.1.

In 1997, Colasanti was convicted of conspiracy to promote gambling. That conviction was expunged in December 2010.  In 2003 and 2004—long before his conviction was expunged—Colasanti submitted applications to be licensed as an owner and driver/trainer.  Those applications required him to disclose that he had been convicted of a crime.  Colasanti failed to identify his gambling conspiracy conviction in both his 2003 application and his first 2004 application.  After the Commission Steward informed Colasanti that his 1997 conviction had been revealed in a background check, Colasanti re-submitted his 2004 application and acknowledged his criminal history.  The Commission denied Colasanti's 2004 application and revoked his 2003 license.

Despite the revocation of his license, Colasanti continued to engage in regulated activities—that is, activities that can only be performed by persons who are licensed by the Commission.  His mother owned and stabled racehorses at Congress Hill Farm.  He transported those horses to and from the farm and Freehold raceway.  He also brushed, walked, and placed the horses in cross ties, which attach to each side of the harness around a horse's head.

A-2795-19

Colasanti was cited with violations alleged to have been committed between February 14 and 16, 2018. Specifically, he allegedly transported racehorses, entered a race paddock restricted to licensed personnel, and failed to cooperate with an investigator conducting a routine inspection at Congress Hill Farm on February 14, 2018. The investigator saw Colasanti exit an equipment room and close and padlock the door. The investigator directed another employee to open the equipment room and discovered what appeared to be a large quantity of impermissible substances and paraphernalia. The investigator then approached Colasanti, who was placing a horse in cross ties. The investigator identified himself and requested Colasanti's name. Colasanti gave his first name but refused to provide his last name.

On June 22, 2018, the Commission's Freehold Racetrack Board of Judges (Board) conducted a hearing. The Board found Colasanti violated regulations and suspended him for two years and imposed a $1,000 fine. Colasanti administratively appealed the Board's findings and the matter was transmitted to the Office of Administrative Law (OAL).

On August 12, 2018, Colasanti made a profanity-laced phone call directed at that investigator after he again discovered—and reported—Colasanti's repeat unauthorized presence on property restricted to licensed personnel.

Both the Commission and Colasanti filed cross-motions for summary decision. The Administrative Law Judge (ALJ) denied Colasanti's motion but granted partial summary judgment in favor of the Commission with respect to the allegation that Colasanti transported racehorses to and from Congress Hill Farm and Freeway Raceway in February 2018.[1]

On August 5, 2019, the ALJ convened an evidentiary hearing for the remaining regulatory violations. Both Colasanti and Commission officials testified at the hearing. Colasanti admitted that he assisted with the care and maintenance of racehorses, transporting them to and from the farm, brushing them, and applying cross ties when they were getting ready for a race. He claimed to be unaware that he was prohibited from engaging in those activities by reason of the revocation of his license.

On December 20, 2019, the ALJ issued an initial decision finding that Colasanti improperly entered the paddock in violation of N.J.A.C. 13:71-6.13 and failed to cooperate with a Commission investigator in violation of N.J.A.C. 13:71-26.7. The ALJ upheld the penalty imposed by the Board.

---

[1] Colasanti does not appeal from the grant of partial summary judgment. Accordingly, the finding that he transported racehorses without being licensed is not before us in this appeal. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived.").

A-2795-19

On August 10, 2018, Colasanti also applied for a groom's license. On October 12, 2018, a Commission Assistant Director conducted an informal hearing to assess Colasanti's character and qualifications. Colasanti was afforded an opportunity to present evidence in support of his application.

On November 29, 2018, the Assistant Director issued a letter denying the groom's license application. The Assistant Director found that Colasanti failed to meet his burden to present evidence of good character, citing the gambling conviction, his failure to disclose the conviction in prior license applications, his working with and transporting racehorses without a license, his failure to cooperate with an investigator, and his "profanity-laced, abusive phone call" made to that investigator. Colasanti appealed the denial and that matter was also transmitted to the OAL.

On December 20, 2019, the ALJ rendered an initial decision finding that Colasanti's conduct demonstrated a lack of integrity that justified the Commission's denial of the license. Colasanti testified he was not aware that the Commission's rules precluded him from transporting or working with racehorses after his license revocation. The ALJ found that testimony was less than credible. In contrast, the ALJ credited the Assistant Director's testimony.

6

The ALJ also held it was improper for the Assistant Director to have considered Colasanti's expunged gambling conviction. The ALJ nonetheless concluded there was sufficient additional evidence to demonstrate Colasanti's lack of character and concluded that he did not satisfy the requirements for licensure.

On January 31, 2020, the Commission issued a Final Agency Decision, adopting the ALJ's findings of fact. The Commission also adopted the ALJ's conclusions of law with one exception: the Commission determined that it was not improper to consider Colasanti's expunged conviction because that conviction "related adversely to the occupation for which licensure was being sought." See N.J.S.A. 2A:168A-1 and -2.[2] The Commission further stressed the highly regulated nature of the horse racing industry and parimutuel wagering,

_____

[2] In support of its decision, the Commission also cited to N.J.A.C. 13:71-7.3, which provides in relevant part:

> The Commission may refuse to issue or renew a license or may suspend or revoke a license issued pursuant to this section if it shall find that the applicant . . . has been convicted of a crime in any jurisdiction, or is associating or consorting with any person or persons . . . convicted of a crime[,] . . . or has consorted with bookmakers, touts[,] or persons of similar pursuits, . . . or has been guilty of or engaged in similar related or like practices.

A-2795-19

highlighting its specific authority "to revoke or refuse to issue a license if in the opinion of the [C]ommission the revocation or refusal to issue such license is in the public interest."  See N.J.S.A. 5:5-33.

I.

We preface our analysis of both appeals by acknowledging that the scope of our review of an administrative agency's final decision is limited.  In re Herrmann, 192 N.J. 19, 27 (2007).  The "final determination of an administrative agency . . . is entitled to substantial deference."  In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 541 (2016) (citing Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Env't. Prot., 191 N.J. 38, 48 (2007)).  "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record."  Herrmann, 192 N.J. at 27.

In contrast, an agency's interpretation of a statute or case law is subject to de novo review.  Russo v. Bd. of Trs., Police & Firemen's Ret. Syst., 206 N.J. 14, 27 (2011) (citing Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)).  Thus, in reviewing an agency's decision, we also examine whether the agency erred in applying the law to the facts.  Twp. Pharmacy v. Div. of Med. Assistance & Health Servs., 432 N.J. Super. 273, 283–84 (2013) (citing In re

8

Stallworth, 208 N.J. 182, 194 (2011)). If our review of the record shows that the agency's finding is clearly mistaken, the decision is not entitled to judicial deference. See H.K. v. Dep't of Human Servs., 184 N.J. 367, 386 (2005).

The burden is on the appellant to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002). See also In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (finding "a 'strong presumption of reasonableness attaches to the actions of the administrative agencies'") (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). An appellate court "ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008); see also Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (noting that the abuse of discretion standard is established "when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis'") (quoting Achacoso-Sanchez v. Immigr. & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

Where an agency's decision satisfies the foregoing criteria, we accord substantial deference, recognizing "the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). We do not second-guess or substitute our judgment for that of the agency, and therefore, we do not "engage in an independent assessment of the evidence as if [we were] the court of first instance." In re Taylor, 158 N.J. 644, 656 (1999) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)); see also Hargrove v. Sleepy's, LLC, 220 N.J. 289 (2015) ("[A] court owes substantial deference to the agency's expertise and superior knowledge of a particular field . . . even if the court would have reached a different result in the first instance.").

Our deference to agency decisions "applies to the review of disciplinary sanctions as well." Herrmann, 192 N.J. at 28 (citing Knoble v. Waterfront Comm'n of N.Y. Harbor, 67 N.J. 427, 431–32 (1975)). "In light of the deference owed to such determinations, when reviewing administrative sanctions, the 'test . . . is "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness."'" Id. at 28–29 (alteration in original) (quoting In re Polk, 90 N.J. 550, 578 (1982)). "The

threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Id. at 29.

## II.

We first consider Colasanti's challenge to the Commission's determination that he violated regulations. Colasanti contends he was under no obligation to cooperate with the investigator who confronted him at Congress Hill Farm. He also contends the penalty imposed was shocking to the sense of fairness. We reject these contentions.

Colasanti argues that pursuant to the plain language of N.J.A.C. 13:71-26.7,[3] the duty to cooperate applies only to persons who are licensed by the Commission. We believe that in the unique circumstances of this case, Colasanti

---

[3] N.J.A.C. 13:71-26.7 provides:

> Every association, all officials and employees thereof, and all persons licensed in any capacity by the Commission shall give every possible cooperation, aid[,] and assistance to any department, bureau, division, officer, agent or inspector, or any other person connected with the United States Government, or with the State of New Jersey, who may be investigating or prosecuting any matter involving a violation of any law, or any rules or regulations of the Commission. Failure to cooperate will subject the person or persons involved to a fine, suspension[,] or both.

A-2795-19

was required to cooperate with the official who confronted him in a restricted area. When, as in this instance, a groom's license is revoked but the person disregards the revocation and continues to transport and work with racehorses—acting essentially as if the license remained in force—that person remains subject to the duty to cooperate. We agree with the Commission that in these circumstances, the failure to apply the regulatory duty to cooperate would hamper the Commission's ability to enforce regulations, investigate possible violations, and ensure the integrity of racing. Even if we were to accept Colasanti's construction of the regulation and reverse the Commission's determination that he breached a duty to cooperate with the investigator under N.J.A.C. 13:71-26.7, the remaining violations amply support the decision to impose a two-year suspension and $1,000 fine.

We reject Colasanti's contention that such a penalty was disproportionate to the violations and inconsistent with penalties imposed by the Commission on other violators. The Commission was authorized to impose a fine up to $50,000. N.J.A.C. 13:71-2.3(a)(2). We deem it especially significant that although knowledge of the rules is not required to violate them, see State v. Wickliff, 378 N.J. Super. 328, 335 (App. Div. 2005), the ALJ found that Colasanti's testimony that he was not aware of the rules was "less than credible." In practical effect,

12

Colasanti ignored the license revocation by continuing to engage in regulated activities. In view of his wanton disregard of the Commission's authority and the restrictions imposed to safeguard the integrity of the horse racing industry, we decline to second-guess the judgment of the Commission as to the amount of the monetary penalty, which in no way is "shocking to one's sense of fairness." Herrmann, 192 N.J. at 28–29 (citing Polk, 90 N.J. at 578).

## III.

Colasanti contends the Commission's final decision to deny his license application was arbitrary and capricious. He claims the Commission improperly considered his expunged conviction and applied the wrong standard when considering his integrity as distinct from his character. We disagree.

Horse racing is a highly regulated industry, and the Commission must ensure public confidence in the integrity of the wagers placed on races. Consequently, the Commission is granted the statutory power to refuse to issue a license in the public interest. N.J.S.A. 5:5-33.

As a general proposition, "the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." N.J.

Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562 (1978). See State v. Dolce, 178 N.J. Super. 275, 286 (App. Div. 1981) (acknowledging the "broad powers conferred upon the Racing Commission in light of statutory policy sought to be achieved by our Legislature"). Furthermore, as we have noted, we recognize the Commission's experience and expertise in matters concerning the racehorse industry. The Legislature has entrusted the Commission to ensure that license applicants are suitable to work in that heavily regulated industry. N.J.S.A. 5:5-34.

Colasanti argues on appeal that the Commission erred in relying on N.J.A.C. 13:71-7.7,[4] which applies to licenses for an owner, driver, and trainer,

---

[4] N.J.A.C. 13:71-7.7 provides:

> All applications for owner, driver[,] and trainer license and registration of stable name and multiple owner registration must be examined by the steward for and on behalf of the New Jersey Racing Commission. The steward shall ascertain if the applicant is qualified as to ability and integrity, and shall report his findings to the New Jersey Racing Commission.
>
> 1. In considering each application for a license, the steward may require the applicant, as well as the applicant's endorsers, to appear before him.

and not just N.J.A.C. 13:71-7.28,[5] which applies specifically to applications for a groom's license. The former regulation expressly refers to the "integrity" of the applicant. The latter regulation does not use the word "integrity," but rather refers to the qualities of "character" and "reputation." Colasanti argues the Commission applied what he claims is a more demanding standard than the one that applies to applicants for a groom's license under N.J.A.C. 13:71-7.28, implying that "integrity" is not an appropriate consideration.

---

> 2. The burden shall be upon the applicant to show that he, she or it is qualified in every respect to receive the license applied for.
>
> 3. Ability, <u>as well as integrity</u>, must be clearly shown by the applicant in order to receive the steward's recommendation to the New Jersey Racing Commission for the granting of the license.
>
> [(emphasis added).]

[5] N.J.A.C. 13:71-7.28 provides in pertinent part:

> An applicant for a license as a groom must satisfy the commission that he possesses the necessary qualifications, both mental and physical, to perform the duties required. Elements to be considered, <u>among others</u>, shall be character, reputation, temperament, experience, knowledge of the rules of racing and of the duties of a groom.
>
> [(emphasis added).]

That contention is meritless. The list of characteristics set forth in N.J.A.C. 13:71-7.28 is not exhaustive, as made clear by the explicit use of the phrase "among others." We believe a license applicant's "integrity" is closely related to—if not indistinguishable—from the qualities of character and reputation. Indeed, in this context, the words "integrity" and "character" are substantially synonymous. The conclusion that an applicant's integrity may be considered in evaluating an application for a groom's license, moreover, is consistent with the ejusdem generis principle of statutory interpretation. Cf. State v. Hoffman, 149 N.J. 564, 584 (1997) (explaining that "[u]nder this rule, when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words") (quoting Hovbilt, Inc. v. Twp. of Howell, 263 N.J. Super. 567, 571 (App. Div. 1993)). We deem Colasanti's integrity, as that term is used in N.J.A.C. 13:71-7.7, to be similar in nature to elements explicitly listed in N.J.A.C. 13:71-7.28—namely, character and reputation. The Commission's determination that Colasanti lacked the requisite integrity to serve as a groom, therefore, was an appropriate consideration in denying his license application.

16

We next turn to Colasanti's contention that the Commission was precluded from considering his expunged gambling conspiracy conviction under Chapter 52 of the New Jersey Code of Criminal Justice, N.J.S.A. 2C:52-1 to -32.1, and the Rehabilitated Convicted Offenders Act (RCOA), N.J.S.A. 2A:168A-1 to -16. We hold that neither statute categorically prohibits the Commission from considering a license applicant's expunged conviction. N.J.S.A. 2C:52-1(a) defines expungement and explicitly lists the governmental entities that are required to remove an expunged conviction from their files. At the time this matter was decided, the relevant part of that statute provided:

> Except as otherwise provided in this chapter, expungement shall mean the extraction and isolation of all records on file within any court, detention or correctional facility, law enforcement or criminal justice agency concerning a person's detection, apprehension, arrest, detention, trial or disposition of an offense within the criminal justice system.

We agree with the Commission that for purposes of chapter 52 of Title 2C, it is a licensing agency, not a law enforcement or criminal justice agency. In E.A. v. N.J. Real Estate Comm'n, we explained:

> Although plaintiff argues that "all persons and all entities must comply" with the expungement order, both the order and the enabling legislation clearly have a more limited reach. The expungement order here is directed solely to the Clerk of the Superior Court and "any law enforcement agency" which possesses

17

relevant records. That focus of the order is consistent with the statutory definition of expungement, i.e., the extraction and isolation of records on file within "any court, detention or correctional facility, law enforcement or criminal justice agency." Plaintiff does not contend, nor do we find any reason to conclude, that either of the defendants is a law enforcement or criminal justice agency. Cf. Maietta v. N.J. Racing Comm'n, 93 N.J. 1, 8–10 (1983); In re Schmidt, 79 N.J. 344, 354–55 (1979). Plaintiff argues, rather, that there is an inequity in permitting a State licensing agency to maintain and use records of an occurrence which is elsewhere "deemed not to have occurred" (N.J.S.A. 2C:52-27). If that result is inequitable, the remedy must be a legislative one.

[208 N.J. Super. 65, 68 (App. Div. 1986).]

Furthermore, under the RCOA, an expunged conviction may be considered provided it is considered as one of several factors. See Storcella v. State Dep't. of Treas., Div. of State Lottery, 296 N.J. Super. 238, 243 (App. Div. 1997) (explaining the RCOA only "prohibits a licensing authority from automatically disqualifying an applicant based on the convictions alone").[6]

The RCOA specifically allows a licensing authority to deny an applicant a license due to a conviction if the conviction relates adversely to the occupation

---

[6] We reject Colasanti's argument that an expungement conclusively establishes rehabilitation, rendering the nature and circumstances of the conviction irrelevant for purposes of a license application. As we have noted, we do not believe a licensing agency is categorically precluded from considering an expunged conviction.

for which the license is being sought. N.J.S.A. 2A:168A-2. That statute provides:

In determining that a conviction for a crime relates adversely to the occupation, trade, vocation, profession[,] or business, the licensing authority shall explain in writing how the following factors, or any other factors, relate to the license or certificate sought:

a. The nature and duties of the occupation, trade, vocation, profession[,] or business, a license or certificate for which the person is applying;

b. Nature and seriousness of the crime;

c. Circumstances under which the crime occurred;

d. Date of the crime;

e. Age of the person when the crime was committed;

f. Whether the crime was an isolated or repeated incident;

g. Social conditions which may have contributed to the crime;

h. Any evidence of rehabilitation, including good conduct in prison or in the community, counseling or psychiatric treatment received, acquisition of additional academic or vocational schooling, successful participation in correctional work-release programs, or the recommendation of persons who have or have had the applicant under their supervision.

19

Based on the above factors, the record before us shows ample factual and legal support for the Commission's decision to deny licensure. We underscore that Colasanti's gambling conspiracy conviction relates directly to public confidence in the integrity of an industry that involves gambling. We note also that defendant's crime was not a youthful indiscretion, as he was nearly thirty years old when the offense was committed in 1996.

We add that even if we were to discount the expunged conviction, as the ALJ aptly noted, there was sufficient additional evidence to demonstrate Colasanti's lack of qualifications for licensure. The ALJ highlighted, for example, his failure to disclose the conviction on license applications submitted years before it was expunged, his lack of credibility in testifying that he was not aware that an unlicensed person could not transport or work with racehorses, and his intemperate interaction with a Commission official. We therefore conclude the Commission's decision to deny the groom's license application is supported by substantial credible evidence and is not arbitrary, capricious, or unreasonable.

To the extent we have not addressed them, any remaining arguments raised by Colasanti lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2795-19