William SHOEMAKER, Angel Cordero, Jr., William Herbert McCauley, Philip Grove and Vincent Bracciole, Plaintiffs,

v.

Hal HANDEL, Executive Director of the New Jersey Racing Commission, Samuel A. Boulmetis, Steward Representing NJ Racing Commission, Joseph F. Piarulli, Associate Steward, Carl H. Hanford, Associate Steward and Richard W. Lawrenson, Associate Steward, Defendants.

Civ. No. 85–1770.

United States District Court, D. New Jersey.

Sept. 9, 1985.

or authority of state law, who allegedly deprive them of their constitutional rights. Plaintiffs are thoroughbred race horse jockeys who complain that the New Jersey Racing Commission's regulations authorizing breathalyzer and urine tests for alcohol and drug use violate several of their constitutionally protected freedoms. They seek a declaratory judgment and permanent injunction against their enforcement. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

Plaintiffs moved for a preliminary injunction to enjoin the enforcement of the contested regulations on April 17, 1985, the date they filed this complaint. On April 24, 1985, oral argument was heard on this motion. This court, on May 13, 1985, issued Findings of Fact and Conclusions of law, in which it denied plaintiffs' motion for a preliminary injunction, ordered changes in the medical disclosure forms used, and directed the state to resolve any ambiguities which might exist in the regulations.[1] The court also set an expedited schedule for discovery and a full bench hearing. On June 18, 19, 21 and July 1, 1985, this court heard testimony as to whether a permanent injunction should issue. For the reasons provided below, the court upholds the constitutionality of these regulations.

The following constitute Findings of Fact and are considered true in all respects.

William L. Bowe, Bowe & Rakinic, Woodbury, N.J., and Edward A. Rudley, Philadelphia, Pa., for plaintiffs.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Steven Wallach, Deputy Atty. Gen., Richard J. Hughes, Trenton, N.J., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge.

This is an action under the Civil Rights Act, 42 U.S.C. § 1983, by which plaintiffs seek relief from persons acting under color

I. *Findings of Fact*

1. Plaintiffs William Shoemaker, Angel Cordero, Jr., William Herbert McCauley, Philip Grove, and Vincent Bracciole are all nationally known thoroughbred race horse jockeys licensed by the State of New Jersey who have won, over their careers, thousands of individual races.[2] Their performances have captured the imagination and loyal following of millions of Americans.

2. Defendants include Hal Handel, the Executive Director of the New Jersey Racing Commission; Samuel A. Boulmetis, a

---

1. *Shoemaker v. Handel,* 608 F.Supp. 1151 (D.N.J.1985).

2. Grove has won over 3,000 races in 18 years; Bracciole 3,200 races in 15 years; and McCauley 1,200 races in nine years.

former jockey and presently State Steward and Assistant Stewards Joseph F. Piarulli, Carl H. Handford, and Richard W. Lawrenson, Associate Stewards, all representing the Racing Commission at the "race meeting" held at Garden State Park, Cherry Hill, New Jersey.

3. Horse racing is a publicly sponsored sport featuring legalized gambling by members of the general public, which, in turn, generates revenue for the state treasury. Its economic impact is broad. When a fire destroyed the Garden State Racetrack in Cherry Hill several years ago, the State Legislature specifically found that it should "be reopened as soon as possible so that economic benefits of an operating track and its attendant service industries will once again flow into the area—and to the State as a whole." N.J.S.A. 5:5-94(c).

4. Jockeys must be in total control of their mental faculties and physical capabilities. Racing requires acute alertness, coordination, skill and reflex ability. The risk of serious injury is apparent considering the speed and number of horses running in a confined area, and is greatly increased if a jockey participates while under the influence of alcohol or controlled dangerous substances.

5. The court can take judicial notice that alcohol and drug abuse is a serious national problem, which could involve upwards of ten percent of the total population. Recent media attention has focused on this problem as it affects professional and amateur athletes. Dr. Robert Pandina, Associate Professor of Psychology at the Center of Alcohol Studies, testified that the degree of risk of drug abuse among athletes is the same as for the general public. TR, Pandina at p. 9. Unannounced drug screening tests administered to minor league baseball players have resulted in between five and thirty percent of those tested recording a "positive" for some drug use. Id.

6. Raymond Edward Deputy has been the State Steward for the Delaware Harness Racing Commission since 1977. He testified that the Commission has adminis-

tered breathalyzer tests since 1969 and urine tests since 1982 to harness drivers on a random basis. TR, Deputy at pp. 32–33. Three to five drivers are required to give urine samples each week. The alcohol testing program produces five to six "positives" each year. Over five hundred harness drivers have been tested for drugs. Fully 14.2% of the drivers tested "positive" for drug use. Id. at 34.

7. Samuel A. Boulmetis has been the State Steward for the Thoroughbred Racing in New Jersey. He has seen "several" people "drunk" or "high" in the Jockey's Room. However, although Boulmetis served as the State Steward at the Meadowlands in 1984, he did not see any jockey at the track impaired prior to a race during that period. He spent an average of fifteen minutes in the Jockey's Room each night. TR, Boulmetis at pp. 20–21. One year ago, two jockeys were found with cocaine at the race track in New Jersey, TR, Bruce Garland, Deputy Director of the New Jersey Racing Commission, at p. 84.

8. Each jockey which testified, with the exception of McCauley, observed other persons impaired at the race track—"six" for Bracciole, "three" for Grove, and "three or four" for Anthony Samuel Black.

9. A review of the National Association of State Racing Commissions Bulletins reveals that in 1984, eleven jockeys were disciplined in eight states and one Canadian province for involvement with drugs. Garland Affidavit at ¶ 7, citing Letter of Charles K. Bradley, Assistant Deputy Commissioner, N.J. Racing Commission dated January 7, 1985.

10. No evidence has been introduced linking a jockey's drug-related impairment with an accident during a race. One accident in Pennsylvania has been linked to alcohol use by a jockey. The vast majority of racing accidents are caused by injuries to the horses.

11. The New Jersey State Legislature has enacted strict controls over horse rac-

ing. N.J.S.A. 5:5–22 *et seq.*[3] It established the New Jersey Racing Commission ("Commission") and vested it with the broad powers necessary to supervise the industry, including the "full power to prescribe rules, regulations and conditions under which all horse racing shall be conducted...." N.J.S.A. 5:5–30. These regulations apply to "all racetracks, all race meetings and all persons and to all matters" within its jurisdiction. N.J.A.C. 13:70–1.1 *et seq.*

12. These regulations apply to jockeys, who are also required to be licensed, and regulates race tracks such as Garden State and Monmouth Parks.[4]

13. To combat alcohol and drug use at the racetrack, the Commission promulgated regulations authorizing the use of breathalyzer tests to detect the presence of alcohol in the blood of jockeys, trainers, officials, and grooms, N.J.A.C. 13:70–14A.10, and urinalyses to detect the presence of controlled dangerous substances not authorized by a valid prescription from a physician. N.J.A.C. 13:70–14A.11. (*See* Regulations attached hereto as Appendix A). These regulations were proposed on June 18, 1984, N.J.R. 1457(a), adopted on January 14, 1985, 17 N.J.R. 470, became effective on February 19, 1985, and operational on April 1, 1985, the first day of thoroughbred racing in New Jersey following their adoption. Garland, who has primary responsibility relating to the rules and regulations of the Commission, testified that the purpose of the regulations was three-fold: (1) to promote the Commission's primary goal of increasing the safety of participants in the race, (2) to promote the integrity and public perception of the cleanliness of the industry, and (3) to rehabilitate those who are found to abuse alcohol and drugs.

14. Oral and written notice of the adoption of these rules were provided to all persons affected and to the Jockey's Guild. TR, Garland at p. 44. Notices were posted at the race tracks. Garland Affidavit at ¶ 11. Each jockey who applied for a 1985 license received a package containing a letter from Commission Executive Director Hal Handel, a sample certification form used for the drug test, and copies of the new regulations. *Id.* The Commission announced at its monthly meeting that the effective date of these rules, April 1, 1985. *Id.* On April 1, 1985, a meeting was held at Garden State Park among representatives of the jockeys, the Jockey's Guild, and the Commission, during which the Commission explained the new regulations. *Id.*

15. The Jockey's Guild unsuccessfully sought to have the Commission defer implementation of the new regulations until a court test of their constitutionality could be made.

16. The Commission's breathalyzer rule is modeled after the harness breathalyzer rule in effect since 1969. TR, Garland at p. 44. It provides as follows:

Officials, jockeys, trainers and grooms shall, when directed by the State Steward, submit to a breathalyzer test and if the results thereof show a reading of more than .05 percent of alcohol in the blood, such a person shall not be permitted to continue his duties. The stewards may fine and suspend any participant

---

**3.** N.J.S.A. 5:5–22 provides:

There is hereby created and established a New Jersey Racing Commission, hereinafter referred to as the commission, which commission shall be vested with and possessed of the powers and duties in this act specified, and also the powers necessary or proper to enable it to carry out fully and effectually all the provisions and purposes of this act. The jurisdiction, powers and duties of the commission herein created and established shall extend under this act to any and all persons, partnerships, associations or corporations which shall hereafter hold or conduct any

meeting within the State of New Jersey whereat horse racing shall be permitted for any stake, purse or reward.

**4.** N.J.S.A. 5:5–37 provides:

The said commission may designate a steward ... to serve at any horse race meeting held under a permit issued under this act ... Such representative ... shall have full and free access to any portion of the space or enclosure where such horse race meeting is held and shall have such powers and duties as the commission may from time to time delegate to them under the provisions of this act.

who records a blood alcohol reading of .05 percent or more. Any participant who records a reading above the prescribed level on more than one occasion shall be subject to expulsion, or such penalty as the stewards may deem appropriate.

N.J.A.C. 13:70–14A.10.

17. Jockeys are required to take the breathalyzer tests daily. TR, Garland at p. 44. Grooms, trainers, and officials are tested with less frequency. *Id.;* TR, Boulmetis; Grove at p. 108; McCauley at p. 80.

18. The breathalyzer apparatus is set up in or near the Jockey's Room and is run by an operator. The test is painless. The testee steps up to the machine and breathes. The machine reads the level of blood alcohol and indicates a "positive" reading by means of a red light that is visible to other persons in the room. TR, McCauley at p. 57; Black at p. 107; Grove at p. 106.

19. The Breathalyzer regulation does not expressly provide procedures to preserve the confidentiality of the results of the tests nor the privacy of its administration. N.J.A.C. 13:70–14A.10. The Commission prefers to administer the tests in private.

20. The penalties for violations of the breathalyzer regulation include fines, revocation or suspension of license, and expulsion from racing in New Jersey. N.J.A.C.

13:70–31.1.[5] Any person disciplined under the regulation may apply to the Commission and receive a hearing.[6]

21. Since April 1, 1985, the thoroughbred racing breath tests have resulted in five positives at Monmouth and Garden State Parks—four for officials and one for a jockey. TR, Garland at p. 58. The harness breath test has also produced some positives each year since 1969, although in recent years they have been limited to one or two. Garland Affidavit at ¶ 5; TR, Garland at p. 57.

22. Jockeys must submit to a post-race urine test "at the direction of the State Steward in a manner prescribed by the New Jersey Racing Commission." N.J. A.C. 13:70–14A.11(b). This test is designed to ensure that the jockeys are not under the influence of any "controlled dangerous substances" or "prescription legend drugs" unless obtained by prescription from a doctor and disclosed to the Commission. *Id.* at 11(a).

23. The Commission has implemented the regulation as follows: The names of all participating jockeys at a given "race meeting" are placed in an envelope. The steward or his representative draws the names of three to five jockeys for testing. A representative of the Jockey's Guild is invited to supervise the selection of names. The Commission has stated that it may

---

**5.** The applicable range of penalties for violations of the Commission's rules and regulations are codified at N.J.A.C. 13:70–31.1, and provide:

(a) The penalties for violation of the law, the rules and regulations or the directives of the commission shall be as follows:

1. Denial, revocation or suspension of license;

2. Monetary fines not exceeding $5,000 for each violation. The stewards may not impose directly a fine in excess of $500.00;

3. Suspension from one or more activities at one or more race tracks;

4. Expulsion from racing in New Jersey;

5. Forfeiture of purse;

6. In addition to the foregoing, the commission may impose as a condition to licensing such conditions as it shall deem appropriate to secure compliance with the rules, regulations and directives of the commission.

(b) The penalties provided above, where applicable, shall be extracted from all persons and/or associations, whether licensed by the commission or not.

**6.** N.J.A.C. 13:70–13A *et seq.* provides the procedures for a hearing. Any person disciplined by the steward of the Commission's officials for violations of the statute or regulations adopted thereunder may appeal to the commission and request a hearing. N.J.A.C. 13:70–13A.1. Hearings before the Commission and the stewards are *de novo* proceedings and include notice and an opportunity to be heard. N.J.A.C. 13:70–13A.3. The Commission may impose directly any disciplinary actions authorized by its rules and regulations. N.J.A.C. 13:70–13A.2. The Commission must act on all appeals "in accordance with the laws of the State of New Jersey and the rules and regulations promulgated by the Commission." N.J.A.C. 13:70–13A.5.

alter the number of jockeys tested per night. TR, Garland at pp. 42–43.

24. The jockeys whose names are selected must provide the sample after their last race that day. The jockey is given a plastic container for this purpose. He fills out a certification form (*See* Certification Form attached hereto as Appendix B) which asks questions concerning the use of prescriptive and non-prescriptive medications. The purpose of the certification form is to provide an exception for use of controlled dangerous substances pursuant to a valid prescription from a licensed physician.

25. The state represents that the jockeys do not have to complete the portion of the form labeled "For Treatment Of," which asks them to disclose the illnesses that the drugs identified treat. Consistent with this representation, the court ordered the Commission to insert the word "Optional" next to the "For Treatment Of" section so as to make the state's policy clear. *Shoemaker, supra,* at 1160–61. The state has complied with the court's order.

26. The certification forms contain two identical numbers. One number is removed and placed on top of the sample and then sealed with the urine specimen. The sample has no other identifying markings. The sample is then sent to the laboratory for overnight testing. The remaining portion of the form is sent to the Executive Director of the Commission and stored in a safe at his office. When the laboratory results are sent to the Executive Director, he determines who had a positive test by matching the numbers. The actual test results, the certification forms, and any other materials generated by this rule are stored in a safe at the Commission and are available only to the Executive Director or his designee and the Commissioners of the New Jersey Racing Commission. Garland Affidavit at ¶ 9(c).

27. The tests results are confidential and will not be supplied to any law enforcement agency, including the New Jersey State Police. Garland Affidavit at ¶ 9(b). The New Jersey Division of Criminal Justice has issued an Advisory Opinion in which it voices no objections to the regulations, is unaware of any statute which would require the Racing Commission. to report suspected drug to prosecutorial authorities and that mere use of Controlled Dangerous Substances is not a crime, but a disorderly persons offense. Garland Affidavit at ¶ 8. The regulations provide only for civil administrative penalties. The Commission would stop testing immediately if the state sought to use the information obtained for a criminal investigation or prosecution. TR, Garland at p. 88.

28. If a positive result is engendered for an individual without a prescription, the Executive Director must follow the steps outlined in the rule.

29. For a first violation, the jockey receives a written reprimand and warning that he will be subject to mandatory drug testing for a period of time on a daily basis and that any further violations will result in sanctions as specified in the regulations. The procedures for administering the test will be the same during the mandatory period as with the regular testing program. *See* N.J.A.C. 13:70–14A.11(d)(2).

30. For a second violation, the jockey must enroll in a Supervisory Treatment Program approved by the Commission, and may continue to participate in racing unless such participation is deemed, by the Executive Director or his designee "to be detrimental to the best interests of racing." Failure to comply with this directive shall subject the jockey to the full range of penalties authorized by N.J.A.C. 13:70–31–1, including fines and expulsion. N.J.A.C. 13:70–14A.11(d)(3).

31. For a third or any subsequent violation, the jockey shall be subject to the penalties in N.J.A.C. 13:70–31–1. He may enroll in the Supervisory Treatment Program only in lieu of these penalties with the approval of the Commission. N.J.A.C. 13:70–14A.11(d)(4).

32. The results of the urine test are confidential except for their use with respect to a ruling issued pursuant to the

urine test rule or for use during the appeals process. Any individual contesting the tests or test results may have a hearing regardless of whether it constitutes his first, second, or third violation.

33. On May 24, 1985, the Commission proposed amendments to the urine testing regulation. (*See* Amendments attached hereto as Appendix C). A public comment period and formal adoption must follow. TR, Garland at p. 49. The Commission seeks to widen the scope of the rule by testing—in addition to jockeys—officials, trainers, and grooms. N.J.A.C. 13:70–14A.11(c), (c) and (d) (proposed). The confidentiality guidelines will be expressly broadened to include any and all information obtained pursuant to the rule. No disclosure of these materials could be made without the approval of the Executive Director of the Commission or his designee. N.J.A.C. 13:70–14A.11(e) (proposed). The Commission would store any information and reports collected for up to a year, after which they would be destroyed. An exception is provided to permit the Commission to maintain records for those "who have violated this rule" without time limit, for the purpose of recording "the number of violations and the results of supervisory treatment and for use should future violations occur." N.J.A.C. 13:70–14A.11(f) (proposed).

34. The Commission is preserving the confidentiality of all information collected under the urine test rule as if the proposed amendments had already been adopted.

35. A jockey may be required to provide a urine sample a maximum of three times within a seven day period. Should a jockey's name turn up in excess of three times, the steward disregards the selection and draws another name. Jockeys subject to mandatory testing due to past violations are not included in this group. At Garden State Park, no rider was selected more than three times in a fifteen day period. TR, Boulmetis at p. 12. At Monmouth Park, plaintiffs McCauley and Bracciole were tested three times within a twenty-four hour period. *Id.*

36. Many jockeys have been unable to provide urine samples when requested. Jockeys "reduce," or lose weight quickly, by eliminating excess bodily fluids so as to lighten the load the horse must carry during the race. This lessens their ability to provide post-race urine samples. TR, Boulmetis at p. 11.

37. The Commission has detained jockeys unable to give urine samples for up to an hour. If the steward determines that a jockey is unable to provide a sample, he is excused and retested the next day he participates, or on a day he is not reducing so heavily. If a jockey leaves without giving a sample or being excused, the state steward contacts him and gives him a hearing. Failure to follow procedures as mandated by the urine test rule can subject jockeys to the penalties provided in N.J.A.C. 13:70–31–1. In one case, a steward fined a jockey for failing to provide a urine sample and for leaving the race track without being excused. Tr, Garland at p. 47.

38. "Positive" test results may measure not only use of drugs at the race track, proximate to race time, but private use of drugs, off regulated premises. For example, marijuana may engender a positive test result even though a jockey did not use it for a week prior to the race and is not presently impaired. The state is using "special procedures" for evaluating positive tests results indicating marijuana use. TR, Garland at p. 55.

39. The State of Delaware has had a drug testing program for its harness racing drivers since 1982. It uses a spot-check "EMIT" test, which is administered on a random basis. If a test result is positive, the sample is taken for a full laboratory analysis overnight. Over 500 harness drivers have been tested under this program. Approximately 14.2% of the samples have turned out positive for drug use. TR, Deputy at p. 34.

40. The Delaware Harness Racing Commission found that the average age for positive test results was 26. Delaware began to test more heavily in this age group. As a result, the number of positive tests

has increased to 18.2% of the total number of tests. *Id.*

41. Since April 1, 1985, the New Jersey thoroughbred racing urine tests have resulted in one positive for cocaine use by a jockey. Two harness drivers in New Jersey have tested positive for cocaine.

42. The Commission chose to implement the urine tests in this manner in order to maximize their value as a deterrent, to promote the public's perception of the industry's ability to regulate itself, to reduce the adversarial nature of the test by treating all jockeys equally, and because jockeys would be reluctant to report or confront peers whom they suspected of being impaired. TR, Boulmetis at pp. 6–7. The jockeys testified that they had sufficient incentive to police themselves, given, that they too, would be riding alongside the impaired person and could be subject to increased risk of a serious accident.

43. The jockeys believe that the urine tests, as administered, unfairly single them out as a group and encourage the public to infer that they use controlled dangerous substances at the race track. They testified that all impaired persons who had access to horses—including owners, trainers, grooms, and the gate crew—posed a risk of serious injury to the participants and should be tested. The state argues that it selected only jockeys for urine testing because of the heightened chance for accidents during the running of a race. TR, Boulmetis at p. 25.

## II. *Conclusions of Law*

Plaintiffs allege that N.J.A.C. 13:70–14A.10 and 14A.11 violate their rights guaranteed by the Fourth, Fifth, and Ninth Amendments and the Due Process and Equal Protection Clauses of the United States Constitution. Specifically, plaintiffs argue that the regulations:

(a) subject jockeys to unreasonable searches and seizures in violation of the Fourth Amendment;

(b) fail to provide a hearing during which plaintiffs can challenge the results of the breathalyzer and urine tests in violation of the due process clause of the Fourteenth Amendment;

(c) discriminate against jockeys as a group by singling them out for breathalyzer and urine testing in violation of the equal protection clause of the Fourteenth Amendment; and

(d) require the disclosure of private medical information, potentially relevant to violations of the criminal law of the State of New Jersey, without adequate safeguards for maintaining its confidentiality in violation of their privacy rights under the Fourteenth Amendment.

The court will address the plaintiffs' claims *seriatim.*

### A. *Search and Seizure Claim*

Plaintiffs argue that because the regulations allow the administration of the breathalyzer and urine tests without some degree of individualized suspicion, they are unreasonable under the Fourth and Fourteenth Amendments.

The Fourth Amendment provides that: The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[7]

■ Defendants argue that Fourth Amendment considerations are not implicated in this case because any searches made pursuant to the Commission's policy would not be used in any criminal investigation or prosecution and are merely conditions of licensure. This contention is without merit. "It is surely anomalous to say that the individual and his private property

---

7. The Fourth Amendment is enforceable against the states through the fourteenth amendment. *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Ker v. California,* 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726 (1963).

are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court,* 387 U.S. 523, 530, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967). All of us are protected by the Fourth Amendment all of the time, not just when the state suspects us of criminal conduct. *McDonell v. Hunter,* 612 F.Supp. 1122, 1126 (S.D.Iowa, Vietor, C.J.). Likewise, licensure is merely a factor which must be included in the court's evaluation of the constitutionality of a search.

The Fourth and Fourteenth Amendments are implicated in this case because the detaining and testing of an individual for the use of alcohol by means of a "breathalyzer" test and use of controlled dangerous substances by means of a "urinalysis" are searches within the meaning of these amendments. *See Storms v. Coughlin,* 600 F.Supp. 1214, 1218 (S.D.N.Y.1984). These two tests are essentially indistinguishable from blood tests, which have been held by the Supreme Court to "plainly constitute searches of 'persons,' and depend antecedently upon the seizures of 'persons,' within the meaning of that Amendment." *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). All three searches involve the forced extraction of bodily fluids—albeit by different means. *Storms, supra,* 600 F.Supp. at 1218. Breathalyzer and urine searches implicate the interests in human dignity and privacy found to be at stake in *Schmerber.*

It is well settled that the Fourth Amendment protects people, not places, *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968); *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *SEC & Law Enforcement Emp. District Council 82 v. Carey,* 737 F.2d 187, 200–01 (2nd Cir.1984), and prohibits only unreasonable searches. *Carroll v. United States,* 267 U.S. 132, 147, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925). The Fourth Amendment vests individuals with the right to be free from "unreasonable government intrusions into their legitimate expectations of privacy." *United*

*States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *SEC & Law Enforcement Emp., supra,* 737 F.2d at 200–01. *See also Bell v. Wolfish,* 441 U.S. 520, 558–59, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

Regulatory officials, as government agents, must act reasonably in their discretion, thereby safeguarding "the privacy and security of individuals against arbitrary invasions...." *Marshall v. Barlow's, Inc,* 436 U.S. 307, 312, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978), *quoting Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). As the Supreme Court has held,

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need of the particular search against the invasion of personal rights that the search entails.

*Bell v. Wolfish, supra,* 441 U.S. at 559, 99 S.Ct. at 1884; *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983); *Prouse, supra,* 440 U.S. at 654, 99 S.Ct. at 1396; *SEC & Law Enforcement Emp., supra,* 737 F.2d at 201. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell v. Wolfish, supra,* 441 U.S. at 559, 99 S.Ct. at 1884.

Under the first prong of the reasonableness test, the intrusion must be viewed in the context of a jockey's legitimate expectation of privacy. Justice Harlan provides the test for determining whether an expectation of privacy is legitimate in *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring): "[T]here is a twofold requirement, first that a person have established an actual (subjective) expectation of priva-

cy, and second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Id.*

██ First, the warrantless administration of breathalyzer and urine tests to jockeys at the race track, proximate to race time does not, *per se,* violate the Fourth and Fourteenth Amendments. Although the Fourth Amendment generally requires a warrant based on probable cause issue before a search occurs, *Terry, supra,* 392 U.S. at 28, 88 S.Ct. at 1883, exceptions exist to this requirement when a legitimate governmental purpose makes the intrusion into privacy reasonable. *SEC & Law Enforcement Emp., supra,* 737 F.2d at 203. The state may conduct administrative warrantless searches when "necessary to further a regulatory scheme and the ... regulatory presence is sufficiently comprehensive and defined...." *Donovan v. Dewey,* 452 U.S. 594, 600, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981). It is the pervasiveness and regularity of the regulatory scheme that ultimately determines whether a warrant is necessary to render an inspection program reasonable under the Fourth Amendment. *Id.* at 606, 101 S.Ct. at 2542.

Warrantless administrative searches of commercial property have been found constitutional for firearms, *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), and liquor, *Colonnade Catering Corp. v. United States,* 397 U.S. 72–77, 90 S.Ct. 774–77, 25 L.Ed.2d 60 (1970), but not under the Occupational Health and Safety Act (OSHA). *Marshall, supra.* The *Biswell* and *Colonnade* cases:

> represent responses to relatively unique circumstances. Certain industries have such a history of government oversight that no reasonable expectation of privacy ... could exist for a proprietor over the stock of such an enterprise ... when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of government regulation.

*Marshall, supra,* 436 U.S. at 313, 98 S.Ct. at 1821.

The New Jersey courts have consistently considered horse racing and casino gambling as demonstrating the same pervasive regulatory factors as liquor and firearms. *Delguidice v. New Jersey Racing Commission,* 100 N.J. 79, 88–90, 494 A.2d 1007 (N.J.1985) (Clifford, J.); *State v. Dolce,* 178 N.J.Super. 275, 283–85, 428 A.2d 947 (App. Div.1981); *In re Martin,* 90 N.J. 295, 313, 447 A.2d 1290 (1982). A New Jersey court recently equated horse racing, casino gambling, and liquor as follows:

> Liquor, with "its inherent evils," has been dealt with as a subject apart." *Grand Union Co. v. Sills,* 43 *N.J.* 390, 398 [204 *A.*2d 853] (1964). The legislative power to regulate such a "nonessential and inherently dangerous commodity," as a wholly constitutional expression of concern for public health, safety, morals or general welfare, has been said to be almost without limit. *Id.* at 403–04 [204 *A.*2d 853]. Horse racing, with attendant legalized gambling, "strongly affected by a public interest," has been held to be a "highly appropriate" subject for close regulatory supervision, *Jersey Downs, Inc. v. N.J. Racing Comm'n,* recognized as desirable for many years, *Niglio v. N.J. Racing Comm'n,* 158 *N.J.Super.* 182, 188 [385 *A.*2d 925] (App.Div.1978). We see every reason, including those expressed in N.J. S.A. 5:12–1b, for legalized casino gambling to take its desired place among those industries.

*In re Boardwalk Regency Casino License Application,* 180 N.J.Super. 324, 341, 434 A.2d 1111 (App.Div.1981).

The public has a special interest in the strict regulation of horse racing. This industry has always been pervasively regulated, in order to minimize the criminal influence to which it is so prone. *Delguidice, supra,* 100 N.J. at 90, 494 A.2d 1007; *Garifine v. Monmouth Park Jockey Club,* 29 N.J. 47, 55, 148 A.2d 1 (1959); *Dolce, supra,* 178 N.J.Super. at 284–85, 428 A.2d 947; *Dare v. State,* 159 N.J.Super. 533, 537, 388 A.2d 984 (1978); *Niglio v. New Jersey Racing Commission,* 158 N.J.Super. 182, 188, 385 A.2d 925 (App.Div.1978);

*Jersey Downs, Inc. v. N.J. Racing Commission,* 102 N.J.Super. 451, 457, 246 A.2d 146 (App.Div.1968); *State v. Garden State Racing Association,* 136 N.J.L. 173 (E & A 1947).

As the New Jersey Supreme Court has held,

The danger of clandestine and dishonest activity inherent in the business of horse racing has been well recognized ... Corruption in horse racing activities is regarded as an affront to a publicly sponsored sport with the potential of far reaching consequences.

It was doubtless with these important considerations that the legislature gave the Racing Commission full regulatory power over horse racing in this state. *Dolce, supra,* 178 *N.J.Super.* at 285 [428 A.2d 947], *N.J.S.A.* 5:5–22 to 5:5–109. In particular, the Racing Commission is empowered to prescribe the rules, regulations, and conditions under which all horse races are conducted, *N.J.S.A.* 5:5–30, and to regulate the licensing of those connected with horse racing, *N.J.S.A.* 5:5–33.

*Delguidice, supra,* 100 N.J. at 90, 494 A.2d 1007. The Legislature has granted the Commission the specific power to "revoke or refuse to issue a license if in the opinion of the Commission the revocation or refusal to issue such license is in the public interest." *Delguidice, supra,* 100 N.J. at 90, 494 A.2d 1007; N.J.S.A. 5:5–33; *Dare, supra,* 59 N.J.Super. at 537, 388 A.2d 984.

In this instant action, the court is asked to approve warrantless searches of persons on regulated property, not merely the regulated property itself. *See, e.g., Biswell* (search for firearms); *Colonnade* (search for liquor). However, the same considerations behind the exception to the warrant requirement are equally applicable to searches of licensed persons, such as jockeys while they are on the regulated premises, such as race tracks. *See Martin, su-*

pra, 90 N.J. at 295, 447 A.2d 1290 (New Jersey Supreme Court has upheld the constitutionality of warrantless searches of the "person and personal effects" of licensed casino employees at licensed casinos).[8] The court found that:

[t]he expectation of privacy in such circumstances is limited, particularly where the applicant has been notified prior to licensing that she will be subject to warrantless searches in the casino facility.

*Id.* at 314, 447 A.2d 1290.

The court has applied the reasonableness test and has weighed the legitimate government interest in maintaining the integrity of the racing industry and the safety of the sport against the legitimate expectations of privacy retained by jockeys and finds that the breathalyzer tests, as administered under the regulations, are reasonable in the absence of a warrant.

However, warrantless searches themselves are also subject to the independent requirement of reasonableness and must further the statutory purposes and regulatory scheme. *Martin, supra,* 90 N.J. at 314, n. 9, 447 A.2d 1290. Whether a search is conducted in an unreasonable manner is a matter to be determined in light of the circumstances of the particular case. *Id.* The critical issue which must be decided—and the most vigorously contested issue between the parties—is whether the warrantless searches administered here—in the absence of any individualized suspicion— are constitutional. The court finds that they are.

To accommodate public and private interests, some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure. *United States v. Martinez-Fuerte,* 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). However, such a requirement is not absolute. As the Supreme Court has held:

8. N.J.S.A. 5:12–79(a)(6) specifically provides:

The division and its employees and agents, upon approval of the director, shall have the authority, without notice and without warrant ... [t]o inspect the person, and personal ef-

fects present in a casino facility licensed under this act, of any holder of a license issued pursuant to this act while that person is present in a licensed casino facility.

In those situations in which the balance of interests precludes insistence upon "some quantum of individualized suspicion," other safeguards are generally relied upon to insure that the individual's reasonable expectation of privacy is not "subject to the discretion of the official in the field." *Prouse, supra,* 440 U.S. at 654–55, 99 S.Ct. at 1396, *quoting Camara, supra,* 387 U.S. at 532, 87 S.Ct. at 1732. "Standardless and unconstrained discretion" is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Prouse, supra,* 440 U.S. at 661, 99 S.Ct. at 1400. *See also, Marshall, supra,* 436 U.S. at 320–21, 98 S.Ct. at 1824. These safeguards include a showing of the legitimate purpose and reasonableness of the procedures followed and the degree to which they minimize the intrusion on the privacy interests of the individual searched. *See, e.g., Martinez-Fuerte, supra,* 428 U.S. at 562, 96 S.Ct. at 3085 (warrantless automobile searches for illegal aliens without any individualized suspicion are constitutional at reasonably located checkpoints). *Cf. Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (random searches by border patrols are unconstitutional without a warrant and in the absence of probable cause).

■ Likewise, the intrusiveness of the search must also be considered. While the Supreme Court has refrained from drawing bright lines among searches, breathalyzer tests and urinalysis are considered less intrusive than body cavity and strip searches. *See Schmerber, supra; United States v. Ramsey,* 431 U.S. 606, 618 n. 13, 97 S.Ct. 1972, 1979 n. 13, 52 L.Ed.2d 617 (1976); *United States v. Des Jardins,* 747 F.2d 499, 504–05 (9th Cir.1984). Body cavity and strip searches are considered among the most intrusive of searches and are usually unconstitutional without a showing of a reasonable suspicion of wrongdoing prior to their utilization. *SEC & Law Enforcement Emp., supra,* 737 F.2d at 202–03; *McDonell, supra,* at p. 1127. In *SEC & Law Enforcement Emp.,* the Second Circuit held that the administration of visual body cavity and strip searches of prison employees for contraband were unconstitutional in the absence of individualized suspicion. In reaching this conclusion, the court recognized the uniqueness of the correctional institutions involved, the deference traditionally afforded prison administrators by the courts, the legitimate governmental interest in the maintenance of the stability, security, and order of its penal institutions, and a corrections officer's diminished expectations of privacy while at work in a penal institution. These interests were balanced against the diminished expectation of privacy held by the prison's employees. *SEC & Law Enforcement Emp., supra,* 737 F.2d at 205; *see also McDonell, supra,* at pp. 1127–28.

In *McDonell,* the District Judge also determined that prison employees could not be forced to submit to blood, urine, and breath tests in the absence of a reasonable suspicion of drug and alcohol use at the facilities. *Id.* As a condition of employment, plaintiff signed a paper allegedly "consenting" to such searches. He was informed that supervisory personnel at the prison had received "confidential information" indicating he had been seen the previous weekend with individuals who "were being looked at" by law enforcement officials regarding drug related activities. The supervisor asked him to undergo a urinalysis. Plaintiff refused and was terminated. Shortly thereafter, he was reinstated and transferred to another facility. The department's policy did not identify who had authority to require such a search, nor did it articulate any standards for its implementation. Defendants argued that such testing was reasonable (1) to identify possible drug smugglers, and (2) because it is undesirable to have drug users employed at correctional institutions. The State failed to persuade the court that the searches reasonably furthered its interests in the absence of reasonable suspicion of wrongdoing:

The possibility of discovering who might be using drugs and therefore, might be more likely than others to smuggle drugs to prisoners is far too attenuated to make seizures of bodily fluids constitutionally reasonable ... No doubt most employers consider it undesirable for employees to use drugs, and would like to be able to identify any who use drugs. Taking and testing body fluid specimens, as well as conducting searches and seizures of other kinds, would help the employer discover drug use and other useful information about employees. There is no doubt about it—searches and seizures can yield a wealth of information useful to the searcher ... That potential, however, does not make a governmental employer's search of an employee a constitutionally reasonable one.

*Id.* at p. 1130.

■ *McDonell* is clearly distinguishable from this instant action on the basis of the evidentiary showing made by the state. The potential for harm here is real—not attenuated. *Shoemaker* differs from *McDonell* precisely because the state has made a sufficient and convincing showing of the need to conduct breathalyzer and urine tests in the absence of any individualized suspicion. First, the court recognizes that horse racing is one of a special class of relatively unique industries which have been subject to pervasive and continuous regulation by the state. *See, e.g., Biswell, supra* (firearms); *Colonnade, supra* (liquor); *Delguidice, supra* (horse racing), and *Martin, supra* (casino gambling). It is a publicly sponsored sport which features legalized gambling on races by the general public, which, in turn, raises revenue for the state treasury. Horse racing is tolerated only under the most controlled of circumstances.

■ Second, jockeys are licensed by the state and have received ample notice of the regulations. Licensure and notice do not, *per se*, constitute a waiver of plaintiffs' Fourth Amendment rights. However, they are factors which must be considered in balancing the strength and merit of the competing interests. As the jockeys admit, licensed participants in an industry subject to strict oversight have a diminished expectation of privacy. Jockeys must accept the unique benefits and burdens of their trade, which includes submission to inspections which reasonably further legitimate state interests. In order to keep the horse racing industry clean and safe, the state has given the Racing Commission the broadest regulatory powers, and the Commission may revoke the license of a jockey if it finds that the public interest will be served. Under these circumstances, the court finds that jockeys have significantly diminished expectations of privacy while engaged in licensed activities on regulated premises, such as race tracks. Society, likewise, has consistently recognized this to be so.

Third, the state has a vital interest in ensuring that horse races are safely and honestly run and that the public perceives them as so. Safe racing promotes the "integrity" of the industry. The state has narrowly tailored and drafted its regulations so as to promote these interests directly. It is clear that horse racing is a highly dangerous sport where injury to participants is commonplace. A jockey must be in full possession of his mental faculties and physical capabilities—his coordination, skill, and reflex ability are critical to good performance. The risk of serious injury is apparent, given the speed and closeness with which large numbers of horses run during a race. Even the slightest decrease in alertness and reflex ability increases the danger of accidents, including multiple horse and jockey accidents causing grave injury and death. In this context, even a single jockey impaired by alcohol and drug use, and participating in several races that evening, will ride proximate to dozens of jockeys and increase the probability that all may be injured.

While the state has introduced little evidence linking accidents with jockeys impaired by alcohol or drugs—only one accident at a race track in Pennsylvania—the court does not believe that this should be the critical and only factor in the analysis.

The state has shown that jockeys have been found in impaired states at the race track in sufficient numbers to indicate a high probability that the testing program will either uncover such use or deter it and thereby prevent accidents. Several jockeys testified to observing their peers impaired by drugs or alcohol at the race tracks— Bracciole saw six impaired jockeys, Black saw three or four, and Grove saw three. Only McCauley did not recall observing a jockey in an impaired state at the track. State Steward Boulmetis, a former jockey, testified that he, too, had seen "several" jockeys impaired at the race track. Within the last year, eight states and one Canadian province disciplined eleven jockeys on drug related problems. In New Jersey, one thoroughbred jockey tested positive for alcohol and one for cocaine since April 1, 1985. The New Jersey harness testing program generated one positive for alcohol and two for cocaine. In Delaware, the Harness Racing Commission's random alcohol and drug testing program has generated five to six positives for alcohol annually, and fully *14.2 percent* of all tests—nearly one in seven—as positives for drugs. Delaware discovered that the prime age for drug use averaged around twenty-six. When Delaware began testing this age group more frequently, the number of positives increased to 18.2% of the total tested. There is no evidence in the record to suggest that New Jersey thoroughbred race horse jockeys are any less likely than Delaware harness race horse drivers to use drugs and/or alcohol. If anything, the lower numbers generated by the New Jersey tests over the last three months suggest that New Jersey's greater frequency of testing is serving as an effective deterrent.

Plaintiffs have argued that the regulations, on their face, give the state steward "unfettered discretion" in selecting jockeys for the drug and breath tests. The state has chosen to describe its testing procedures as "random" based. However, they are not random in the sense that they allow the state steward unlimited discretion in selecting testees. The regulations, as ad-ministered by the Commission, strip the stewards of any such discretion. The fair characterization of these tests is that they are administered neutrally, with procedural safeguards substituting for the lack of any individualized suspicion. All jockeys are treated equally. The state's program requires that *all* jockeys submit to breathalyzer tests. Further, every jockey participating in racing on a given evening has an equal chance of being selected to give a urine sample under the name drawing system. The state reserves the right solely to vary the total number of jockeys tested at each race meeting from three to five.

There is considerable evidence that a testing approach which requires some element of individualized suspicion would actually *increase* the ability of the steward to act in an arbitrary and unreasonable manner by enabling him to select jockeys for testing without any clearly defined and objective behavioral criteria for detecting impairment. Given that jockeys often would be singled out for testing as a result of their behavioral manifestations, this testing procedure would prove considerably more adversarial and subject to abuse over the long term. Finally, the testing regimen administered by the Commission serves as the broadest and most effective deterrent. In the jockeys' close community, peer pressure would otherwise prevent many from identifying riders who might be impaired. Likewise, jockeys cannot escape detection by masking their symptoms.

The regulations also provide solely for civil administrative penalties, which might include fines, and suspension or expulsion from racing in New Jersey. They promote the rehabilitation of jockeys through treatment programs. The State's Division of Criminal Justice has advised the Racing Commission that it will not seek to use or obtain information gathered pursuant to these regulations, knows of no statute or regulation which requires the Commission to turn over any information it obtains under these rules to criminal enforcement authorities, and that the use of controlled dangerous substances is not a crime—only

a disorderly persons offense. The regulations provide for testing only on licensed premises—race tracks—proximate to race time.

The jockeys argue that the urine tests measure more than just impairment at the race track. Previous private use of certain drugs, off race track premises, may generate a "positive" result without any indication of a jockey's present impairment. The court finds that the state has been sufficiently careful in implementing its testing procedure so as to guard against false positives which might serve to punish jockeys for their private behavior off regulated premises. First, any positive test is checked against the certification form for valid drug use, pursuant to a prescription from a physician. Second, only a significant drug presence will generate a positive reading. Third, the state is using special procedures to guard against misinterpretation of positives for marijuana use, given that metabolites signifying such use may remain in the urine for weeks. Fourth, a jockey can request a hearing to fight the tests, test results, and the imposition of any penalties he believes wrongfully administered under the regulations. Given the public interest in clean, safe racing, the ability of the Racing Commission, under its broad statutory mandate, to revoke any license "in the public interest," and the availability of penalties which affect only a jockey's status to race in the State of New Jersey and fines, the court finds the procedures used sufficient to protect the jockeys' interests.

■ Finally, jockeys "reduce," or lose weight quickly to lighten their load during a race. As a result, several jockeys have been unable to provide post-race urine samples. The state has excused those jockeys unable to provide a sample within a reasonable period, and in all circumstances, less than one hour. A jockey is penalized only if he leaves without being excused. The court finds this procedure reasonable so long as the period of time in which a jockey must wait to give a sample is a minimal one.

Under the circumstances presented in this case, the court is persuaded that the breathalyzer and urine regulations, as administered by the Commission, do not violate plaintiffs' right to freedom from unreasonable searches and seizures.

B. *Due Process Claim*

■ Plaintiffs allege that the regulations violate the Due Process Clause of the Fourteenth Amendment because they do not expressly provide a hearing at which they can challenge the results of the tests or any penalties imposed. The court disagrees. First, a license to race is a property interest. *See Niglio, supra,* 158 N.J.Super. at 189–90, 385 A.2d 925. The United States Supreme Court has consistently held that some form of hearing is required before an individual is finally deprived of his property interest. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1975); *Wolff v. McDonell,* 418 U.S. 539, 557–58, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews, supra,* 424 U.S. at 333, 96 S.Ct. at 902; *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970); *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965); *see Grannis v. Ordean,* 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). Due process is flexible and calls for such procedural protections as the particular situation demands. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

The court finds that plaintiffs are entitled to a hearing to challenge the results of any test administered under the breathalyzer and urine test rules or any penalty imposed therein. N.J.A.C. 13:70–13A.1 provides for such a hearing "[w]hen any person is disciplined by the stewards or any official representing the Commission pursuant to the laws of New Jersey or rules of the Commission." The court finds that the procedures as provided are attenuated by

all of the constitutional and statutory safeguards inherent in the requirement of due process. Therefore, the court finds no deprivation of plaintiffs' constitutional right to due process under law.

## C. *Equal Protection Claim*

Plaintiffs allege that the regulations violate the Equal Protection Clause of the Fourteenth Amendment because (1) only jockeys are subject to urine testing and (2) while jockeys, trainers, officials, and grooms are subject to breathalyzer testing, only jockeys and officials are so tested.

An individual has no fundamental right to be a jockey. New Jersey may, at its option, bar horse racing within the state entirely. Likewise, jockeys do not comprise a "suspect class" such as categorizations based upon race, national origin, religion, alienage, and gender. Therefore, the state's testing program need bear only some "rational relationship" to legitimate state purposes. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16, *reh'g denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). Perfection in making a classification "is neither possible nor necessary." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976). The regulatory classification may be invalidated only if it manifests arbitrary discrimination between persons similarly situated. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461–66, 101 S.Ct. 715, 722–25, 66 L.Ed.2d 659 (1980).

The court finds that the classification scheme adopted by the Commission is rational and clearly furthers the state's interest in maintaining the safety of the racing industry. Safety concerns are greatest during the running of the race, when the most serious accidents can occur. For the same reason, it is reasonable that the state would use its limited resources to test jockeys for alcohol impairment with greater frequency than grooms and trainers. The court finds that these regulations, on their face and as administered, do not violate plaintiffs' rights to equal protection under law.

## D. *Privacy Claim*

Plaintiffs argue that the regulations violate their constitutional right to privacy. Their claim is three-fold. First, they assert that the Commission does not have sufficient justification to require jockeys to disclose their use of prescription and other non-prescription medications, as required by the certification form. Second, they contend that even if the Commission can require disclosure of this information, the regulation does not provide adequate safeguards against its public disclosure. Likewise, plaintiffs assert that the regulation does not sufficiently provide for the safe storage, timely destruction, and confidentiality of all information obtained pursuant to the drug testing rule. Third, they argue that the results of the breathalyzer tests are not protected by any confidentiality or disclosure guidelines, and that testing in a non-private setting is impermissible.

The Supreme Court has recognized a "right to privacy" founded on the Fourteenth Amendment's concept of personal liberty. *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The extent and full breadth of the right to privacy has never been fully delineated. However, the relevant case law can be summarized as follows:

> The cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

*Whalen v. Roe, supra,* 429 U.S. at 598–600, 97 S.Ct. at 875–76; *Barry v. City of New York,* 712 F.2d 1554, 1558 (2nd Cir.1983). These two interests have been characterized by the Fifth Circuit as interests in "confidentiality" and in "autonomy" respectively. *Plante v. Gonzalez,* 575 F.2d 1119, 1128 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90

(1980). The interest in autonomy has encompassed matters relating to marriage, procreation, contraception, family relationships and child rearing and education. *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3rd Cir.1980), *quoting Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976). This instant action implicates the interest in confidentiality. The right to privacy has been held to extend to the "individual interest in avoiding disclosure of personal matters." *Whalen v. Roe, supra*, 429 U.S. at 599–600, 606, 97 S.Ct. at 876, 879.

[12] The right to privacy is not absolute. The state has the power to compel disclosure of otherwise private information when its interest in the information outweighs the individual's interest in non-disclosure. *Plante, supra*, 575 F.2d at 1134. The Third Circuit has articulated several factors which must be considered in evaluating the competing interests:

> the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating towards access.

*Westinghouse, supra*, 638 F.2d at 578.

■ First, there is a substantial governmental interest in the strict regulation of horse racing so as to preserve and promote its safety and integrity. The legislature has substantial power to regulate non-essential, dangerous, and sensitive industries to protect the public safety and welfare.

*Delguidice, supra* (horse racing). *See also Martin, supra* (casino gambling); *Niglio, supra* (horse racing). The state has a legitimate interest in preventing the use of alcohol and dangerous controlled substances by jockeys in such a manner as would affect their performance in, and the outcome of races. The certification form requires jockeys to disclose the names of prescribed medications, the names of persons who prescribed them, and the date and time of the last dosage of each medication taken. The form also requires jockeys to disclose the names of over-the-counter medications used, and the date and time of the last dosage taken. The part of the form pertaining to disclosure of the illness being treated by the medications is optional.[9]

The disclosure of the medical information as required by the form narrowly furthers the state's legitimate interests. Only those jockeys submitting urine samples must complete the forms. They are used as a check against the results of any test which might otherwise be considered as "positive" for drug use. Further, the state treats these forms as confidential, in the same manner as the results of the urine tests. The court finds that the use of the certification forms, as modified by the court's Order of May 23, 1985, does not violate plaintiffs' right to privacy.

■ Second, the court finds that the urine test regulations as administered by the Commission, provide sufficient safeguards against disclosure, for safe keeping, and for their timely destruction. While the regulations expressly provide that only "results" of urine tests are subject to confidentiality, the Commission has promulgated regulations in response to this court's directive,[10] which would extend

---

9. The court previously ordered the Commission to insert the word "Optional" by those portions of the form which pertain to disclosure of the illness treated and are labeled "For Treatment Of." This is fully consistent with the state's representation that it did not require completion of these sections. *Shoemaker, supra*, 608 F.Supp. at 1160.

10. The Commission proposed the amended rules in response to the court's directive in its Opinion of May 23, 1985:

> The court believes that the Racing Commission can take affirmative, immediate measures to clarify any ambiguities which may exist. The Commission's regulations should contain provisions governing the storage of and access to the information collected, the

such protection to all information gathered pursuant to the rule. All such information will be stored in a safe at the offices of the Commission. Information gathered will be routinely destroyed after one year, with an exception for data from jockeys who have tested positive. Once a jockey has tested positive for drug use, the data can be retained to record the number of violations, the result of any treatment programs, and for use in considering future violations. Disclosure of information is limited to those individuals at the Racing Commission who have a specific and legitimate interest in the testing results—the Commissioners, the Executive Director or his designee, and the jockey. The proposed regulation would also include the Commission's counsel. The information is subject to disclosure only during a contested matter. The state has represented to the court that although these regulations have yet to be formally adopted by the Commission, it is proceeding to treat all information gathered under the rule as if governed by the proposed confidentiality procedures. The record is completely devoid of any evidence to suggest that the Commission, or any other person or body involved in the adjudication of disputes under the rule, will or did act in a manner inconsistent with plaintiffs' rights.

■■■ Likewise, plaintiffs' argument that the regulations require them to divulge potentially self incriminating material is without merit. The regulations provide for only civil administrative penalties. The State Division of Criminal Justice will not seek to obtain information gathered under the rule for criminal investigations or prosecutions. Use of controlled dangerous substances with a valid prescription from a licensed physician is not illegal. Mere use of such drugs without a prescription is not a crime—only a disorderly persons offense. The court finds, therefore, that the urine test rule, as administered, does not violate plaintiffs' privacy rights.

■■■ Third, plaintiffs also claim that the breathalyzer tests violate their privacy rights because (1) any information obtained therefrom is not subject to any confidentiality regime, and (2) the tests are not administered to the jockeys privately. First, the state does not represent to the court that the data collected in the administration of the breathalyzer rule is subject to the same confidentiality procedures operative under the urine test rule. The court finds that the balance of interests asserted require the state to treat the information generated by the breathalyzer tests in the same manner as that gathered under the urine test rule. Second, the state argues that it would prefer to give the breathalyzer tests privately and is working towards meeting this goal, but that logistical problems have prevented private administration to date. Although the court recognizes that jockeys have diminished expectations of privacy while in the Jockey's Room at the race track, it concludes that, as a matter of law, the state must administer these tests privately, away from the view of persons who are not required for the administration of the tests.

### E. *Conclusion*

For the reasons provided above, the court finds that the breathalyzer test is subject to the same confidentiality guidelines as is the urine test and must be given privately, away from the view of persons who are not required for its administration. Plaintiffs' prayer for relief is denied in all other respects. An appropriate order will be entered.

### APPENDIX A

### ADOPTIONS

### LAW AND PUBLIC SAFETY

(a)

### NEW JERSEY RACING COMMISSION

Thoroughbred Rules:
Breathalyzer Test; Urine Test

---

length of time data will be kept, and the precautions utilized to safeguard the information from disclosure. Should defendants fail to take measures to remedy existing ambiguities from the regulations, the court reserves its right to reconsider injunctive relief.
*Shoemaker, supra,* 608 F.Supp. at 1161, n. 3.

Adopted New Rules: N.J.A.C. 13:70–14A.10 and 14A.11 (proposed as 13:70–14A.13 and 14A.15)

Proposed: June 18, 1984 at 16 N.J.R. 1457(a).

Adopted: January 14, 1985 by New Jersey Racing Commission, Harold G. Handel, Executive Director.

Filed: January 28, 1985 as R.1985 d.57, without change.

Authority: N.J.S.A. 5:5–30.

Effective Date: February 19, 1985.

Operative Date: April 1, 1985.

Expiration Date pursuant to Executive Order No. 66(1978): February 19, 1990.

Summary of Public Comments and Agency Responses:

No comments received.

Full text of the adoption follows.

13:70–14A.10   Breathalyzer test

Officials, jockeys, trainers and grooms shall, when directed by the State Steward, submit to a breathalyzer test and if the results thereof show a reading of more than .05 percent of alcohol in the blood, such person shall not be permitted to continue his duties. The stewards may fine or suspend any participant who records a blood alcohol reading of .05 percent or more. Any participant who records a reading above the prescribed level on more than one occasion shall be subject to expulsion, or such penalty as the stewards may deem appropriate.

13:70–14A.11   Urine test

(a) No jockey shall use any Controlled Dangerous Substance as defined in the "New Jersey Controlled Dangerous Substance Act", N.J.S.A. 24:21–1, et seq. or any prescription legend drug, unless such substance was obtained directly, or pursuant to a valid prescription or order from a licensed physician, while acting in the course of his professional practice. It shall be the responsibility of the jockey to give prior notice to the State Steward that he is using a Controlled Dangerous Substance or prescription legend drug pursuant to a valid prescription or order from a licensed practitioner.

(b) Every jockey for any race at any licensed racetrack may be subjected to a post-race urine test, or other non-invasive fluid test at the direction of the State Steward in a manner prescribed by the New Jersey Racing Commission. Any jockey who fails to submit to a urine test when requested to do so by the State Steward shall be liable to the penalties provided in N.J.A.C. 13:70–31.

(c) Any jockey who is requested to submit to a post-race urine test shall provide the urine sample, without undue delay, to a Chemical Inspector of the Commission. The sample so taken shall be immediately sealed and tagged on the form provided by the Commission and the evidence of such sealing shall be indicated by the signature of the tested jockey. The portion of the form which is provided to the laboratory for analysis shall not identify the individual jockey by name. It shall be the obligation of the jockey to cooperate fully with the Chemical Inspector in obtaining any sample which may be required and to witness the securing of such sample.

(d) A "positive" Controlled Dangerous Substance or prescription drug result shall be reported, in writing, to the Executive Director or his designee. On receiving written notice from the official chemist that a specimen has been found "positive" for controlled dangerous substance, or prescription legend drug, the Executive Director or his designee shall proceed as follows:

1. He shall, as quickly as possible, notify the jockey involved, in writing;

2. For a jockey's first violation, he shall issue a written reprimand and warning and notify the jockey that he will be subject to mandatory drug testing and that any further violation shall result in the sanctions described in paragraphs (3) and (4) below;

3. For a jockey's second violation, he shall require the jockey to enroll in a Supervisory Treatment Program approved by the New Jersey Racing Commission upon such reasonable terms and conditions as he may require. The jockey shall be permit-

ted to participate unless his continued participation shall be deemed, by the Executive Director of his designee, to be detrimental to the best interests of racing. It shall be the jockey's responsibility to provide the Commission with written notice of his enrollment, weekly status reports, and written notice that he has successfully completed the program and has been discharged. If a jockey fails to comply with these requirements, he shall be liable to the penalties provided in N.J.A.C. 13:70-31.

4. For a jockey's third or subsequent violation, he shall be liable to the penalties provided in Subchapter 31 and may only enroll into a Supervisory Treatment Program in lieu of said penalties, with the approval of the New Jersey Racing Commission.

(e) The results of any urine test shall be treated as confidential, except for their use with respect to a ruling issued pursuant to this rule, or any administrative or judicial hearing with regard to such a ruling. Access to the reports of any "positive" results shall be limited to the Commissioners of the New Jersey Racing Commission, the Executive Director and/or his designee and the subject jockey, except in the instance of a contested matter.

## APPENDIX B

DATE _____    TRACK _____

JOCKEY'S NAME _____

I AM ☐
AM NOT ☐

Taking prescription medication or over the counter medication.

If you are taking either or both of the above complete the following

Name of Prescribed medication(s) _____

_____

_____

Prescribed By:    _____

For Treatment Of:    _____

Last Dose:    Time:_____    Date: _____

Name of Over-the-Counter Medication: _____

_____

_____

For Treatment Of:    _____

Last Dose:    Time: _____    Date: _____

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signature: _____

**1110**

## PROPOSED AMENDMENTS TO URINE TEST RULE

13:70–14A.11   Urine Test

(a) No [jockey] licensee or official shall use any Controlled Dangerous Substance as defined in the "New Jersey Controlled Dangerous Substance Act", N.J.S.A. 24:21–1, et seq. or any prescription legend drug, unless such substance was obtained directly, or pursuant to a valid prescription or order from a licensed physician, while acting in the course of his professional practice.   It shall be the responsibility of the [jockey] Official, Jockey, Trainer and Groom to give [prior] notice to the State Steward that he is using a Controlled Dangerous Substance or prescription Legend drug pursuant to a valid prescription or order from a licensed practitioner when requested.

(b) Every [jockey] Official, Jockey, Trainer and Groom for any race at any licensed racetrack may be subjected to a [post-race] urine test, or other non-invasive fluid test at the direction of the State Steward in a manner prescribed by the New Jersey Racing Commission.   Any [jockey] Official, Jockey, Trainer or Groom who fails to submit to a urine test when requested to do so by the State Steward shall be liable to the penalties provided in N.J.A.C. 13:70–31.

(c) Any [jockey] Official, Jockey, Trainer and Groom who is requested to submit to a [post-race] urine test shall provide the urine sample, without undue delay, to a chemical inspector of the Commission.   The sample so taken shall be immediately sealed and tagged on the form provided by the Commission and the evidence of such sealing shall be indicated by the signature of the tested [jockey] Official, Jockey, Trainer or Groom.   The portion of the form which is provided to the laboratory for analysis shall not identify the individual [jockey] Official, Jockey, Trainer or Groom by name.   It shall be the obligation of the [jockey] Official, Jockey, Trainer or Groom to cooperate fully with the Chemical Inspector in obtaining any sample which may be required and to witness the securing of such sample.

(d) A "positive" Controlled Dangerous Substance or prescription drug result shall be reported, in writing, to the Executive Director or his designee.   On receiving written notice from the official chemist that a specimen has been found "positive" for controlled dangerous substance or prescription legend drug, the Executive Director or his designee shall proceed as follows:

1.   He shall, as quickly as possible, notify the [jockey] Official, Jockey, Trainer or Groom involved in writing.

2.   For an [jockey's] Official, Jockey, Trainer or Groom's first violation, he shall issue a written reprimand and warning and notify the [jockey] Official, Jockey, Trainer or Groom that he will be subject to mandatory drug testing and that any further violation shall result in the sanctions described in paragraphs (3) and (4) below:

3.   For an [jockey's] Official, Jockey, Trainer or Groom's second violation, he shall require the [jockey] Official, Jockey, Trainer or Groom to enroll in a Supervisory Treatment Program approved by the New Jersey Racing Commission upon such reasonable terms and conditions as he may require.   The [jockey] Official, Jockey, Trainer or Groom shall be permitted to participate unless his continued participation shall be deemed, by the Executive Director or his designee, to be detrimental to the best interests of racing.   It shall be the [jockey's] Official Jockey, Trainer or Groom's responsibility to provide the Commission with written notice of his enrollment, weekly status reports and written notice that he has successfully completed the program and has been discharged.   If an [jockey] Official, Jockey, Trainer or Groom fails to comply with these requirements, he shall be liable to the penalties provided in N.J.A.C. 13:70–31.

4.   For an [jockey's] Official, Jockey, Trainer or Groom's third or subsequent violation, he shall be liable to the penalties provided in Subchapter 31 and may only enroll into a Supervisory Treatment Pro-

gram in lieu of said penalties, with the approval of the New Jersey Racing Commission.

(e) The results of any urine test shall be treated as confidential, except for their use with respect to a ruling issued pursuant to this rule, or any administrative or judicial hearing with regard to such a ruling. Access to the reports of any "positive" results shall be limited to the Commissioners of the New Jersey Racing Commission, the Executive Director and/or his designee and the subject [jockey] Official, Jockey, Trainer or Groom except in the instance of a contested matter.

## AMENDMENTS TO URINE TEST RULE

e) Any information collected in the process of obtaining a urine sample, including but not limited to medical information, the results of any urine test, and any reports filed as a result of attending a Supervisory Treatment Program shall be treated as confidential, except for their use with respect to a ruling issued pursuant to this rule, or any administrative or judicial hearing with regard to such a ruling. Access to the collected information and/or reports of any positive results and/or reports from a Supervisory Treatment Program shall be limited to the Commissioners of the New Jersey Racing Commission, the Executive Director and/or his designee, Counsel to the Racing Commission, and the subject, except in the instance of a contested matter. In the instance of a contested matter, any collected information and reports shall not be disclosed without the approval of the Executive Director or his designee.

f) Information collected and reports prepared pursuant to this rule shall be stored in a locked secure area in the office of the Executive Director for a period of one year, after which time, they shall be destroyed. However, the Commission may maintain the collected information and reports on individuals who have violated this rule for the purpose of recording the number of violations and the results of supervisory treatment and for use should future violations occur.